# Shope v. Alabama F. & I. Co.

### Assault and Battery.

(Decided November 25, 1915.   70 South. 279.)

Master and Servant; Tort of Servant; Scope of Employment; Jury Question.—In this case it was a question for the jury whether the sheriff was acting for the company when he arrested plaintiff, in order to intimidate her and her husband into keeping their son away from the mining company's property; the action being by the woman against such mining company for an alleged assault committed upon her by a deputy sheriff in the course of his employment by the defendant company in keeping undesirables and trespassers off of defendant's property.

APPEAL from St. Clair Circuit Court.

Heard before Hon. J. E. BLACKWOOD.

[Shope v. Alabama F. & I. Co.]

Action by Mrs. Ola Shope against the Alabama Fuel & Iron Company for damages for an alleged assault. Judgment for defendant, and plaintiff appeals. Reversed and remanded.

WHEELER F. WHITAKER, and A. G. & E. D. SMITH, for appellant. PERCY, BENNERS & BURR, for appellee.

GARDNER, J.—Appellant brought suit against appellee to recover damages for an alleged assault and battery committed on her by an agent or agents of the defendant company while acting within the line or scope of their authority. No question of pleading is presented. There was no special plea filed, and the cause appears to have proceeded to trial upon plea of the general issue. Considerable testimony was offered both by the plaintiff and defendant, and upon the conclusion of all the evidence the court gave, in writing, at defendant's request, the general affirmative charge in its behalf, and which action constitutes the sole assignment of error.

It seems to be conceded by counsel for the respective parties in their briefs that the affirmative charge was given upon the theory that there was no evidence tending to show that one Self, or other agent of defendant company, acted, in regard to the matter complained of, within the line and scope of his authority, and that therefore no liability could attach to defendant.

The record shows that one A. M. Self was appointed a deputy sheriff by the sheriff of St. Clair county, and that he received no compensation from said sheriff, and was paid a regular salary by the defendant company to perform duties for them at their mining camp, called "Margaret." He was appointed a deputy upon the request of either Deloney, the superintendent of mines at Margaret, or De Bardeleben, the vice president and general manager of defendant company. Said Deloney was a notary public and ex officio justice of the peace. The only compensation received by said Self was the sum of $90 a month paid by defendant company, and such fees as he might receive through said Deloney's court.

The matters complained of by the plaintiff grew out of an alleged assault on her by said Self on June 21, 1914. Counsel for appellee insist that all arrests, assaults, and acts of like character committed by a public officer who receives his compensation

from a private corporation are prima facie committed by him in his official capacity, and not as a servant of the corporation.— *McKain v. B. & O. R. R. Co.,* 65 W. Va. 233, 23 L. R. A. (N. S.) 289, 131 Am. St. Rep. 964, 17 Ann. Cas. 634; *Penn. R. R. Co. v. Kelly,* 177 Fed. 189, 101 C. C. A. 359, 30 L. R. A. (N. S.) 481; *Layne v. C. & O. R. R. Co.,* 66 W. Va. 6607, 67 S. E. 1103. This general proposition does not appear to be controverted by counsel for appellant, and, indeed, no reference thereto is found in their brief. They insist, however, that the evidence was sufficient for submission to the jury that Self was acting in the line and scope of his authority at the time of the alleged assault. Speaking to the question of law above noted, as asserted by counsel for appellee, the West Virginia court, in *Layne v. R. R. Co., supra,* recognizing the above-stated rule as correct to the effect that prima facie such public officer acts in his public capacity, said: "If he was engaged in some sort of service for the corporation and did a wrongful act in the course of such service, and within the scope of his employment, or by express direction of his employer, the latter is liable. * * * But there is frequently contradictory evidence as to employment, the nature and extent of the service, and other matters pertaining to the authority or lack of authority in the officer to act on behalf of the defendant, and in all such cases the jury must determine whether there is liability or not. * * * The defendant is not liable merely because it procured the appointment of the officer or pays his salary or does both. * * * From these propositions it results, as a necessary sequence, that the plaintiff has the burden of showing the express or implied authority in the officer to perform the injurious act for and on behalf of the defendant. As such authority may be express, as by request or direction, or implied, as by employment of the officer and inclusion of the act, of which the killing was an incident, within the scope of the service to be rendered, it is sometimes necessary to seek it in a mass of contradictory oral evidence and inconclusive, but relevant, circumstances. These are general principles of the doctrine of respondeat superior, not materially altered or varied by the fact that the servant is also a public officer. This additional circumstance simply raises a question as to the capacity in which the party holding the two positions at the same time acted, and often forms the basis of an hypothesis for jury con-

sideration which would not otherwise exist.  *  *  *  If the plaintiff would fix liability upon another for his act, he must prove the relation of master and servant. That he was a public officer is beyond question, but it does not follow that he was not also a servant, nor that he acted as a public officer, and not as a servant, in the transaction to which the killing was incident. The real issue was whether Howery acted on behalf of the company or the public in the transaction between himself and Layne in which the latter was incidentally killed. At the time of this transaction he was both officer and servant, and, in general, acting as such. The jury question was the capacity in which he acted in that particular transaction."

It appears that the court in the above-cited case recognized as a general proposition that, when the capacity in which a person acts when occupying the dual position of public officer and corporation servant is uncertain and dependent upon conflicting testimony and inconclusive facts and circumstances, the question is one for the determination of a jury.

That Self in the instant case was an agent or servant of the defendant company is without dispute. The question for determination here, therefore, is whether or not he was acting as a public officer for and on behalf of the public, or acting on behalf of the company employing him and within the line and scope of such employment. In the recent case of *Republic I. & S. Co. v. Self*, 192 Ala. 403, 68 South. 328, it was said: "In this class of cases, to authorize the submission of the question to the jury, the evidence must tend to show that the wrong was committed by the agent while he was executing his agency, and not from a motive or a purpose of his own, having no relation to the business of the master. If the evidence tends to show that it was an incident to carrying on the master's business, the master may be held liable, though he did not authorize the agent to resort to such means in rendering the service for which he was employed."

And in *Hardeman v. Williams*, 169 Ala. 57, 50 South. 794: "The principal is responsible for the acts of his agent done within the scope of his employment and in the accomplishment of objects within the line of his duties, though the agent seek to accomplish the master's business by improper or unlawful means, or in a way not authorized by the master, unknown to him, or

even contrary to his express direction. The legal aspect of such a case is not changed because the agent superadds malice or other personal motive to his wrongful act."

Frequent reference is found in the cases to that of *Case v. Hulsebush,* 122 Ala. 212, 26 South. 155, in which case the tax collector of Mobile county was held personally liable for an assault and battery committed by his deputy on a taxpayer who had gone to the collector's office to pay his taxes. The assault in that case grew out of a dispute about a fee the deputy sought to collect. In the more recent case of *Gassenheimer v. West. Ry. of Ala.,* 175 Ala. 319, 57 South. 718, 40 L. R. A. (N. S.) 998, it was held that the assault grew out of delay in the delivery of plaintiff's freight, and that liability therefor attached. Other cases of interest in this connection are *Ala. F. & I. Co. v. Rice,* 187 Ala. 458, 65 South. 402; *Miller-Brent Lumber Co. v. Stewart,* 166 Ala. 657, 51 South. 943, 21 Ann. Cas. 1149; *Avondale Mill v. Bryant,* 10 Ala. App. 507, 63 South. 932; *B. R., L. & P. Co. v. Crenshaw,* 192 Ala. 462, 68 South. 327.

The difficulty in cases of this character lies more in the proper application of the rules of law to the particular facts of the case, rather than to the correct statement of the rules themselves. Upon a careful examination of the record we are persuaded that there was evidence sufficient for submission to the jury of the question as to whether or not Self was acting for the company at the time and within the line and scope of his duties. We deem a detailed statement of the testimony showing such tendencies to be unnecessary, and will make but brief reference to some of the salient features.

We have already referred to Self's employment by the defendant company and his appointment as deputy sheriff at the request of those who managed its affairs, and that he received no compensation other than his salary and such fees as he procured from the justice court of said Deloney, the general superintendent of the mines at that camp. There was testimony tending to show that Self looked after the rental and repair of the houses of the defendant at said camp; that he kept order, and, in fact, "policed the camp;" that he met trains at Sanie station, and often kept undesirable people away. One Lovejoy, witness for the defendant company, on cross-examination said: "I have known him to keep people away from there who were thought to

[Shope v. Alabama F. & I. Co.]

be undesirable, and have been with him when he made such arrests. He has several times called on us employees when he had a difficult job like that. Mr. Deloney is general superintendent. Deloney is also a notary public and ex officio justice of the peace, and I have known a number of cases in which Mr. Self has arrested people and carried them in there and had them tried and convicted in order to get them out of the camp."

J. L. Shope, husband of the plaintiff, testified in this connection as follows: "I know A. M. Self, and have known him for about two years. He is deputy for the defendant, and looks after the house rent and sees that no one comes inside the quarters. He gets the laborers out to work in the morning, and goes around and sees after things in general. He frequently goes over to Sanie station, and meets the trains, and any one getting off he asks their business and where they are going, and very often turns them back if they don't talk to suit him. He won't allow them to go on the premises at Margaret in the camp. He had been doing this for about two years or more before the occurrence complained of."

On cross-examination Self testified, among other things, as follows: "If a man would come in camp and create a disturbance or violate the law, I would look after him. I got no pay from Sheriff Love. I got fees from Mr. Deloney's court, or justice court, but no fees from the county court. The company paid me $90 per month—a flat salary. It was my duty, in case people coming over there seeking labor or anything like that, to confer with them and get them out of the camp. I have made a good many arrests there. I would not say whether I have made as many as 500 arrests or not. I met the trains at Sanie when I had business there, when it was necessary."

The evidence shows that Paul Shope, 16 year old son of the plaintiff, had been accustomed to delivering a Birmingham paper to a large number of subscribers among the employees in said camp. There was evidence tending to show that the presence of the boy in the camp was undesirable. Indeed, the superintendent, Deloney, testified that much complaint had been made in the camp with reference to his not being wanted in the quarters, and that he had told Self that the boy was objectionable, and to see his father and request that he stop him from coming into the camp. Self testified that he had not said anything to

the boy himself about going into the quarters, but had told his father that the boy was very undesirable, and that he had told the Shopes he had been instructed to speak to them about the boy. The testimony of J. L. Shope, father of the boy, is to the effect that he met Self on Saturday morning previous to the alleged assault on Sunday, at which time Self told him that he intended for the boy to stay out of the camp, that he had instructions to that effect and meant to keep him out, and that when he met him the next day, at about 11 o'clock, at the station, Self again reminded him to keep the boy out of the camp and to stay out himself, and that if he did not he would lock them all up in the Ashford jail. The plaintiff testified that on that Sunday Self told her that he had orders to keep the boy and his father from trespassing on the camp property. The husband of plaintiff further testified that when the alleged assault was being committed upon his wife Self made the remark that he had "the company to back him up."

It is the contention of the defendant that the alleged assault was at the time when Self was attempting as a public officer to arrest the plaintiff and her husband for offenses they had committed, and that Self's conduct and the arrest were in no manner connected with his duties with the company. Self insists that he had warrants for their arrest at the time, though nothing seems to have been previously said concerning them, and some of the witnesses for the defendant testified that the warrants were read to them, while those for the plaintiff testified to the contrary, and insist that the plaintiff or her husband demanded that the warrants be read and exhibited. The warrants appeared to have been sworn out before Deloney, who testified that Self appeared there at noon on Sunday and asked for them. The one purporting to have been sworn out by one Gresham was for an alleged offense committed some ten days previous, and a warrant sworn out by one McKinney against the husband of the plaintiff was sworn out on the 22d day of June; all the others bearing date of June 21st. Testimony for the plaintiff further tends to show that after the alleged assault she was first carried up to the camp to the office of the company, and that she was treated by the company physician, that she waived to the grand jury examination as to the warrants against her, and that she has never been further arrested

on them. In the arrest of plaintiff Self was assisted by Jones and Rainey, both of whom were employees of the defendant company. It is the insistence of counsel for appellant that these warrants, and, in fact, the whole matter, grew out of the business of the defendant company, in the effort of Self to have the boy kept out of the camp in obedience to his orders to that effect, and that the use of the office as deputy sheriff by Self and his assistants was but the putting on a cloak for the purpose of disguising, or attempting to disguise, the real appearance of the situation.

The general authority and duty of Self under his employment by the company has heretofore been referred to, one of which duties the jury had a right to infer was the keeping of undesirables out of the camp. That the son of the plaintiff was undesirable to those in charge of defendant's business, and that Self had been instructed by the general superintendent to keep the boy out, is not disputed. There was sufficient evidence from which a reasonable inference might be drawn by the jury that the entire affair grew out of the effort of Self to carry out the instructions of Deloney to keep the boy out of the camp, and that Self was acting, as to matters here complained of, within the line and scope of his duties. It was therefore a question for the determination of the jury.

The insistence is made by counsel for appellee that, even should it be found that Self, as an agent of the corporation, had implied authority to defend the company's property and keep trespassers therefrom, yet he had no implied authority on behalf of the company to punish persons for offenses against the company after these offenses were committed, citing *Markley v. Snow*, 207 Pa. 447, 56 Atl. 999, 64 L. R. A. 685, and *McKain v. R. R. Co., supra.* We do not deem this question necessary to be considered, as such is clearly not the contention of counsel for appellant on this appeal. The contention is, as we understand it, that it was among Self's duties to keep undesirables and trespassers from defendant's property, and that he was endeavoring to do so and attempting to enforce obedience to his orders upon the parents of the boy, by. intimidation or otherwise, and thereby prevent a further trespass on his part. There was not concerned, therefore, any question as to a mere punishment by an agent for a past offense.

[Mobile Light & Railroad Co. v. Portiss.]

From what we have here said it follows that, in our opinion, the trial court committed reversible error in giving the affirmative charge at the request of the defendant.

The judgment is therefore reversed.

Reversed and remanded.

ANDERSON, C. J., and McCLELLAN and SAYRE, JJ., concur.