[Supreme Lodge Loyal Order of Moose v. Kenny.]

# Supreme Lodge Loyal Order of Moose *v.* Kenny.

### Death of Initiate

(Decided November 16, 1916.   Rehearing denied December 30, 1916.
73 South. 519.)

1. **Insurance; Fraternal Orders; Chartered Lodge.**—Where a local lodge was chartered by the Supreme Lodge of the World, Loyal Order of Moose, and the Supreme Lodge was organized as a fraternal and benevolent order, and the ritualistic ceremonies of the local lodge, including the initiation of candidate, were prescribed by the Supreme Lodge, and the local lodge was instructed in ritualistic work by a supreme instructor appointed by the supreme dictator and the members of the local lodge became members of the supreme lodge, entitled to certain sick and death benefits, and the appliances used in certain electrical stunts in the initiation of candidates had been approved by the supreme dictator, the local lodge acted in initiating candidates as an agent of the supreme lodge.

2. **Principal and Agent; Acts of Agent; Liability of Principal.**—A principal is responsible for the acts of his agent done within the scope of his employment and within the line of his duties, notwithstanding the agent seeks to accomplish the business of his principal by improper or unlawful means, or in a way not authorized or known to his principal, or even contrary to his express instructions.

3. **Insurance; Fraternal Order; Local Lodge; Power; Initiation.**—On the evidence in this case it cannot be said as a matter of law that the local lodge did not have apparent authority to make certain electrical stunts part of its initiatory work.

4. **Same; Apparent Authority; Reliance on.**—In such a case a stranger while a candidate for membership in the order had a right to rely upon the apparent authority of the local lodge initiating him to make certain electrical appliances parts of his initiation.

5. **Charities; Negligence; Liability for Fraternal Order.**—The fact that the Supreme Lodge of a fraternal order had established a home for the widows and orphans of its members for the maintenance of which each member of the order paid one dollar per year did not relieve it from liability for the death of a candidate while being initiated into a local lodge since such candidate was neither seeking nor receiving charity.

6. **Appeal and Error; Additional Briefs; Requisites.**—Since the rule requires the filing of an original brief discussing the assignments of error that are urged as error, an argument in a supplemental brief as to matters not urged or argued in the original brief will not be considered.

APPEAL from Birmingham City Court.
Heard before Hon. C. W. FERGUSON.
Suit by Thomas P. Kenny, as administrator of the estate of Donald A. Kenny, deceased, against the Supreme Lodge of the

World, Loyal Order of Moose, Birmingham Lodge No. 432, Loyal Order of Moose, and certain officers of the lodge. Judgment directed in favor of the Birmingham Lodge No. 432, Loyal Order of Moose, and the individual defendants, and judgment rendered against defendant Supreme Lodge of the World, Loyal Order of Moose, and it appeals. Affirmed.

Suit by plaintiff (appellee) as administrator of the estate of Donald A. Kenny, deceased, for the recovery of damages for the death of intestate, who is alleged to have met his death while being initiated as a member of the Loyal. Order of Moose. The intestate, a young man of about 23 years of age, applied for membership in the above-named order to the local lodge of said order known as Birmingham Lodge No. 432, Loyal Order of Moose. During the progess of the initiation of intestate, as an applicant for membership in said lodge, there was used what are referred to as "certain electrical stunts," one known as the "branding stunt," and the other as the "prize ring." In the "branding stunt" the victim was placed on a board and, while strapped there, a current of electricity was passed through him by means of wires attached to his ankles, the current being completed by means of another wire attached to a razor and applied to the back of his neck. The "prize ring" was a mat containing numerous wires interlaced throughout its entire surface, around which mat were chains supported by posts; both mat and chains. being charged with electricity. A wooden box was placed on this mat, and three or four of the candidates were placed in the ring with boxing gloves, and instructed to box; the electricity was then turned on, and the candidates were supposed to make a scramble for the box, which was only large enough to hold one at a time.

The evidence as to the strength of the current varied and was in conflict. There was some evidence tending to show that. intestate was in the "prize ring," but much of the evidence indicated that the "prize ring stunt," on the night intestate was killed, was abandoned before his initiation. There was evidence tending to show that he was placed on the branding board, and that there was a probability he there received a shock sufficient to cause his death. There was also evidence going to show that on the same night another applicant for membership, going through the same initiation, met his death also. There was evidence tending to show that intestate was physically sound, and had been so pronounced, and evidence for the defendant to the

contrary. There was much evidence introduced on the part of defendant tending to show that the current of electricity used on that night was not sufficient to cause death, and was in fact not dangerous.

This suit was brought against the appellant, the Supreme Lodge of the World, Loyal Order of Moose, a corporation organized under the laws of Indiana, and also against the Birmingham Lodge No. 432, Loyal Order of Moose, which was organized according to the constitution and by-laws of the Supreme Lodge, but which was not incorporated. A number of individuals, officers of the lodge, who were present on the night of his initiation, were also made parties defendant.

There were originally three counts in the complaint; the second and third, however, being charged out by the court, and the cause submitted to the jury on the first count, charging simple negligence. The court gave the affirmative charge in favor of the Birmingham Lodge No. 432, Loyal Order of Moose, and also the individuals who were parties defendant. The cause was submitted to the jury, therefore, on the question of liability on the first count of the complaint, charging simple negligence as against the Supreme Lodge of the World, Loyal Order of Moose, resulting in a judgment in favor of the plaintiff in the sum of $18,000, from which judgment defendant prosecutes this appeal. The first count of the complaint charged, in substance, that the defendants were engaged in or about initiating into the order, known as the "Loyal Order of Moose," the plaintiff's intestate, or in or about the administration of certain rites or performances connected or associated with such initiation; and so negligently conducted themselves in reference thereto that as a proximate consequence of said negligence the death of intestate was caused. The evidence further tended to show that the electrical apparatus in that lodge for initiating candidates was not the property of that lodge, but had been borrowed from another lodge in the city, of a different order, and that these "stunts" had been given candidates in initiation for some several months before this accident happened. There was also evidence to show that a representative of the Supreme Lodge designated as "Supreme Instructor" had previously visited the Birmingham Lodge, had seen these "stunts" given candidates during the initiation, and had approved of same.

ARTHUR H. JONES, ALLEN & BELL and BURGIN, JENKINS & BROWN, for appellant. HARSH, HARSH & HARSH, for appellee.

GARDNER, J.—The appellant, the Supreme Lodge of the World, Loyal Order of Moose, is a corporation organized under the laws of the state of Indiana. The purposes of its organization are thus stated by counsel for the appellant in brief:

"It was organized for and its objects were to organize subordinate lodges having ritualistic ceremonies; to unite in bonds of fraternity, benevolence and charity all acceptable male persons of good character; to educate and improve its members morally, socially and intellectually; to assist its members in time of need; to aid and assit the widows and orphans of deceased members of the order; to encourage its members in patriotism and obedience to the laws of the country, and in the tolerance of religion; and to have and hold such real estate and personal property as may be necessary for the purposes of this association. And, further, that the Supreme Lodge should have the power and authority to prescribe ritualistic ceremonies for the various subordinate lodges. The officers of the Supreme Lodge were known and designated as follows: Supreme Past Dictator, Supreme Vice Dictator, Supreme Dictator, Supreme Prelate, Supreme Secretary, Supreme Treasurer, Supreme Sergeant at. Arms, Supreme Inner Guard, Supreme Outer Guard, five members of the Supreme Council, and three Supreme Trustees, with power in the Supreme Lodge to create and fill such other and further offices as it may deem to the best interest of the order. The power and authority of each and every officer of the Supreme Lodge was specifically prescribed and designated by the by-laws, rules and regulations governing the said Supreme Lodge of the World, Loyal Order of Moose. In accordance with the power, and the purposes and objects for which the said Supreme Lodge was organized, there was organized and existing a local lodge known as Birmingham Lodge No. 432, Loyal Order of Moose, which was organized according to the constitution and by-laws and articles of incorporation of the Supreme Lodge of the World, Loyal Order of Moose."

The evidence tended to show that the Supreme Lodge of the World, Loyal Order of Moose (hereinafter referred to as the Supreme Lodge), had complete control of all the subordinate lodges in all matters, including those relating to the initiation of candidates; and there was provided what was known in the order

[Supreme Lodge Loyal Order of Moose v. Kenny.]

as a "Supreme Instructor," who was appointed by the officer known as the "Supreme Dictator," and whose duty it was to visit the various subordinate lodges and instruct them in lodge work which included ritualistic work of the order, and to report to the Supreme Dictator in regard to the work of the subordinate lodges. The evidence shows that the Supreme Instructor, one Rogers, had visited the local or subordinate lodge known as Birmingham Lodge No. 432 some several weeks prior to the night on which the intestate met his death, and had seen and approved the use of the identical apparatus which was used in the initiation of candidates on the night of the fatal accident.

The local lodge at Birmingham was not a separate corporation from the Supreme Lodge; but it operated under a charter from the Supreme Lodge, and in connection with its lodge rooms maintained clubrooms, a bar and cigarette stand in the clubrooms, which were run as a financial proposition, and under a special permit from the Supreme Lodge.

There was evidence also showing that one who became a member of the lodge, and paid his monthly dues, was entitled to a sick benefit of $7 per week for not exceeding 13 weeks in any one year, and in case of his death to a benefit of $100; and in addition thereto was entitled to receive the services of the lodge physician for himself and members of his family. The Supreme Lodge prescribes the rules governing that feature of the order, and, indeed, enacts all the laws of the order. A certain per capita tax was required to be paid to the Supreme Lodge by the various subordinate lodges. The following extracts from the laws of the Supreme Lodge will give some indication of the authority of the officer known as the Supreme Dictator:

"And between sessions of the Supreme Council, have general supervision and control of the order, and grant such dispensations as he may consider for the best interest of the order, when not inconsistent with the laws thereof, or when not in conflict with the instructions of the Supreme Council."

"He may hear and decide such complaints and questions of law as are submitted to him in writing by subordinate lodges or members thereof, and his decision upon all questions so submitted, shall be final and in effect until reversed by the Supreme Forum."

"When in the opinion of the Supreme Dictator the conditions of any subordinate lodge are such as to warrant it, he may suspend or revoke the charter of such lodge. * * * The Su-

[Supreme Lodge Loyal Order of Moose v. Kenny.]

preme Dictator shall.have full power and authority to suspend any officer of the Subordinate Lodge, pending an investigation of his accounts or his actions, and appoint a successor to act during the time of such suspension, which suspension may be continued until the final disposition of the cause."

"He shall also have the right to appoint competent members (past dictators if possible) as Deputy Supreme Dictators for each individual lodge when in his opinion such appointment is desirable, and he shall perform all other duties prescribed by the Supreme Council and execute the general laws of the order."

Speaking of the authority of the Supreme Instructor, the laws of the order provide as follows:

"He shall have jurisdiction as may be designated by the Supreme Dictator, or Supreme Council, and shall perform such duties as the Supreme Dictator may designate."

The Supreme Instructor, hereinbefore referred to, who had visited the Birmingham Local Lodge some time previous to the night of this accident, had seen what is referred to as the "electrical stunts" given candidates in their initiation, known as the "branding stunt" and the "prize ring," and who had approved of same, was introduced as a witness upon this trial. Testifying in regard to his authority, he said:

"My authority as Supreme Instructor which was vested in me by the constitution was the performance of any duties allotted to me by the Supreme Dictator of the Supreme Lodge of the World, Loyal Order of Moose. * * * My duties * · * * as Supreme Instructor, as assigned to me by the Supreme Dictator, were to visit the lodges, to instruct them in ritual work where they were a little backward, make public speeches, inspect the books of all the officers, and perform such other duties as he might request of me under the constitution and by-laws. * * * Most assuredly my authority came from the Supreme Dictator and he sent me out to examine the lodges and instruct them in ritualistic work, and any other authority that he conferred upon me would be my authority. When he would send me out I told myself what to do; that is, I had the territory from the Ohio river to the Gulf and from the Atlantic to the Pacific, and sometimes jump to Canada. My title was that of Supreme Instructor. I am a member of the Supreme Lodge simply by having served as dictator of the Louisville Lodge and having the office conferred upon me at Detroit, and I am a member of the Supreme Lodge. When I came to Birmingham I came on official business. * * *

[Supreme Lodge Loyal Order of Moose v. Kenny.]

While I was traveling, I carried out my official duties.  *  *  *
I was visiting the lodges and representing the Supreme Dictator
and acting under his authority.  *  *  *  I was known all over
the country as Supreme Instructor, after my first commission
was given me by Brother Jones in 1911, and when I came to Bir-
mingham in February, 1913, I was recognized by the lodge here
as Supreme Instructor."

There was evidence tending to show also that the "organizer"
of the lodge, as well as the "deputy organizer," had witnessed
the initiation ceremony with the electrical apparatus used on the
night of this accident.

The evidence discloses that there was purchased by the Su-
preme Lodge a body of land consisting of 1,000 acres near Aurora,
Ill., for the purpose of establishing a vocational school where
orphan children of the members of the order, as well as their
widows, could find a home.  It is designated as "Mooseheart,"
and for its support $1 a year is paid in by each member of the
order.  The total membership of the order at the time of the
trial was, as testified to, "about 550,000 members, 1,615 lodges."

(1, 2)  In the original brief of counsel for appellant filed upon
the submission of this cause there are two features of this case,
by way of defense to this cause of action, treated as questions
of prime importance on this appeal and involving its salient
points.  It is first insisted that no such relation existed between
the Supreme Lodge and the local lodge in the initiation of candi-
dates for membership as to create the relation of principal and
agent, and therefore no liability could attach to the appellant for
any negligence on the part of the members of the local lodge in
the initiation of candidates.  It is urged in brief that a frater-
nal organization, such as the appellant, is to be distinguished
from those which are known as "mutual benefit societies," and
that the same rules applicable to the one should not apply to the
other.—Bacon on Benevolent Societies, vol. 1, § 130.  While, in
many respects, the appellant may be purely a fraternal organi-
zation, yet certain features of the order, hereinbefore mentioned
as a sick and death benefit, and the privilege of the attendance
of a physician in case of sickness upon the member and any of
his family, would clearly indicate that it had at least some very
strong resemblance to mutual benefit societies.  However this
may be, and without any decision as to the same, we are of the
opinion there can be no distinction as between the two so far
as the question of principal and agent, under the facts and cir-

cumstances here presented, is concerned. The following quotation taken from the case of *Hardeman v. Williams*, 169 Ala. 50, 53 South. 794, found in the recent case of *Republic Iron & Steel Co. v. Self*, 192 Ala. 403, 68 South. 328, L. R. A. 1915F, 516, succinctly states the rule as recognized in this state:

"The principal is responsible for the acts of his agent done within the scope of his employment, and in the accomplishment of objects within the line of his duties, though the agent seek to accomplish the master's business by improper or unlawful means, or in a way not authorized by the master, unknown to him, or even contrary to his express direction."

See, also, *Shope v. Alabama Fuel & Iron Co.*, 195 Ala. 312, 70 South. 279.

The Supreme Court of South Carolina had, in the case of *Mitchell v. Leech*, 69 S. C. 413, 48 S. E. 290, 66 L. R. A. 723, 104 Am. St. Rep. 811, presented for consideration a very similar case. The plaintiff there sought damages for injuries received while being initiated into a subordinate camp of the Woodmen of the World in consequence of the use of a mechanical goat. There the Sovereign Camp Woodmen of the World was sued, and the question of its liability for the wrong of the local camp in the initiation of the plaintiff into the order appears to have been the question of prime importance upon the appeal. Many of the provisions of the laws of the Sovereign Camp are set out in the opinion of the court, wherein we also find the following observation: "There is nothing in the ritual of the order authorizing the use of a mechanical goat as a part of the ceremony in the initiation of a member.

The court concluded that the subordinate camps were the agents of the Sovereign Camp, and that the latter was liable for the torts of the former committed in initiating members into the lodge. We quote the following from that case:

"In order to accomplish the objects for which the sovereign camp was organized, it was necessary, from the very nature of the business, to call to its assistance the services of persons through whom it might act, in transacting the affairs of the order in various localities. It selected and organized local lodges for the purpose of meeting this necessity. Not only the subordinate camps, but the members as well, were under the complete direction and control of the parent camp, in whose name the benefit certificates were required by the constitution to be issued;

and, when a member died, payment of the benefit certificate was to be made by the sovereign camp. These facts show that, when a person was initiated in a local lodge, he became, to all intents and purposes, a member of the sovereign camp. And they further show, under the authority of *Blackwell v. British-American Mortg. Co.*, 65 S. C. 118, 43 S. E. 395, that the subordinate camps were the agents of the sovereign camp. In the case just mentioned the court uses this language: 'The business of the company was such as necessarily compelled it to rely upon the work of other parties, and this necessity usually and naturally gives rise to the employment of agents. When, therefore, this work is done by others, there is a strong implication that they are the agents of the parties receiving the benefit of their services.' Our conclusion that the subordinate lodge was the agent of the sovereign camp is in harmony with the cases of *Supreme Lodge K. of P. v. Withers*, 177 U. S. 260, 20 Sup. Ct. 611, 44 L. Ed. 762; *Murphy v. Independent Order S. & D. of J. of A.*, 77 Miss. 830, 27 South. 624, 50 L. R. A. 111; and *Bragaw v. Supreme Lodge K. & L. of H.*, 128 N. C. 354, 38 S. E. 905, 54 L. R. A. 602. As the subordinate lodges were the agents of the sovereign camp, the acts of the local camps were binding upon the parent camp, if performed within the scope of the agency, even though not authorized by the sovereign camp. The court, in the case of *Hutchison v. Rock Hill Real Estate & Loan Co.*, 65 S. C. 75, 43 S. E. 295, quotes with approval the following language from section 452 of Storey on Agency: 'It is a general doctrine of law that, although the principal is not ordinarily liable (for he sometimes is) in a criminal suit for the acts or misdeeds of his agent, unless, indeed, he has authorized or co-operated in them, yet he is held liable to third persons in a civil suit for the frauds, deceits, concealments, misrepresentations, negligences and other malfeasances and omissions of duty of his agent in the course of his employment, although the principal did not authorize or justify or participate in, or, indeed, know of, such misconduct, or even if he forbade the acts or disapproved of them. In all such cases the rule applies, respondeat superior; and it is founded upon public policy and convenience, for in no other way could there be any safety to third persons in their dealings either directly with the principal, or indirectly with him through the instrumentality of agents. In every such case the principal holds out his agent as competent and fit to be trusted, and thereby, in effect, he warrants his fidelity and good conduct in all matters

within the scope of the agency.' To the same effect is the case of *Reynolds v. Witte,* 13 S. C. 5, 36 Am. Rep. 678."

We are impressed with the holding of the South Carolina Supreme Court in the above-cited case to the effect that the subordinate lodges, under the facts as there disclosed, acted as agents of the parent organization in the initiation of candidates for membership to the lodge.

In the very charter of the appellant corporation, one of the first purposes specified for its organization was "to organize subordinate lodges having ritualistic ceremonies; to unite in bonds of fraternity, benevolence, and charity all acceptable male persons of good character." Without this object being attained, that is, the organization of subordinate lodges, the Supreme Lodge would have no basis or foundation upon which to rest its superstructure; its very existence depending upon the organization of subordinate lodges whereby new members may be taken in; and the revenues thus derived support the organization in all its works. As disclosed by the testimony in the case, and as noted herein, the organization has succeeded to the extent of attaining a membership of over 500,000, and the reorganization of subordinate lodges in excess of 1,600. Not only the prosperity and success of the Supreme Lodge depended upon the organization of the subordinate lodges, and the reception of members, but the very life of the corporation depended upon holding these subordinate lodges and their membership intact. Without these subordinate lodges, and the membership thereby acquired, the Supreme Lodge would be but a skeleton, a shadow, a mere legal entity without substance. The subordinate lodges, therefore, were authorized to take in new members. In the acceptance of new members and in their initiation into the lodge they were given certain ritualistic work; the character of such ritualistic work seems not to have been fully disclosed in this record. It appears that the only way for an applicant to become a member of this organization was through the subordinate lodges; they were under the control of the Supreme Lodge. The subordinate lodge, as disclosed herein, was unincorporated, and in deed and in fact merely represented an aggregation of the membership of the parent organization in that particular locality, receiving its charter from the Supreme Lodge. The candidate joining the subordinate lodge was, of course, then a member of the order; and it does not appear that he could become a member in any other manner. The subordinate lodges were organized for this purpose and are recog-

nized by the charter and laws of the Supreme Lodge as being the very lifeblood of the organization. We are therefore of the opinion that the conclusion is irresistible that these subordinate lodges, in taking in and initiating candidates into membership of the lodge, were acting as the agents of the Supreme Lodge. We think this conclusion is supported not only by the case of *Mitchell v. Leech, supra,* and the authorities therein cited, but also by the Court of Appeals of New York in the case of *Thompson v. Supreme Tent of Knights of Maccabees,* found reported in 189 N. Y. 294, 82 N. E. 141, 13 L. R. A. (N. S.) 314, 121 Am. St. Rep. 879, 12 Ann. Cas. 552.

(3, 4) It is further insisted, however, that even if it be conceded that the local or subordinate lodge was the agent of the Supreme Lodge, in the reception and initiation of new members, still the evidence is insufficient to establish liability upon the appellant here for the reason that the local lodge was acting, in the use of the electrical apparatus in the initiation of intestate, beyond the scope of its authority. As before stated, what the ritualistic work of the order was, in full, had not been made to appear clearly in this record; but the counsel for appellant rests the contention just stated upon that clause, which, it is testified, is contained in the ritual that prohibits any "jesting or practical jokes in the initiatory work."

We have hereinbefore called attention to the power and authority given under the laws of the order to the officer known as Supreme Dictator, and his authority to appoint a Supreme Instructor, whose duties included the giving of instructions in ritualistic work to subordinate lodges. The ceremony of initiation, with the electrical apparatus used on the night of the fatal accident, had been in use some time previous thereto, and had been seen and approved by the Supreme Instructor. It cannot therefore be said, as a matter of law, that the subordinate lodge did not have the apparent authority to give that particular initiatory work.—*Penn. Fire Ins. Co. v. Draper,* 187 Ala. 103, 65 South. 923. The intestate, a stranger, a candidate for membership in the order, had, it would seem, a right to rely upon this apparent authority of the local lodge to give this particular initiation.

There is evidence tending to show that on the night intestate met his death that merely preliminary obligations were given before the initiation was indulged in, and that it was the custom to then put the candidates through the initiation, which was followed by the final obligation. That the intestate was being

[Supreme Lodge Loyal Order of Moose v. Kenny.]

initiated into the order by the subordinate lodge is of course without dispute.

We have concluded that the subordinate lodge, in thus taking in new members, was acting as the agent of the Supreme Lodge. Even though, therefore, it should be said that the agent in this work stepped beyond its master's instructions, yet, nevertheless, as the agent was acting within the scope of its duties or its authority, the principal is liable, though the agent seeks to accomplish the master's business in an improper way, or one not authorized by the master, or even contrary to his expressed direction.— *Republic Iron & Steel Co. v. Self, supra; B. R., L. & P. Co. v. Crenshaw,* 192 Ala. 462, 68 South. 327.

We are mindful of the rule which exempts the master from liability when the servant or agent steps aside from the scope of its employment and commits a tort for his own personal gratification, and in no manner connected with the accomplishment of the object of his employment. Such a case is represented by that of *Kirby v. Louisville & Nashville Railroad Co.,* 187 Ala. 443, 65 South. 358, recently decided by this court; as well also that of *Medlin Milling Co. v. Boutwell* from the Supreme Court of Texas, decided in 104 Tex. 87, 133 S. W. 1042, 34 L. R. A. (N. S.) 109, and cases of like character to which attention has been directed in appellant's supplemental brief. The rule there recognized, however, we do not deem applicable to the instant case for the reason that the local lodge, in taking in new members and initiating them into the order, was acting within the scope of its authority and agency and in the accomplishment of the objects of the Supreme Lodge.

As holding contrary to the conclusion here reached, we are cited by counsel for appellant to the following cases: *Grand Temple, etc., v. Johnson,* (Tex. Civ. App.) 135 S. W. 173, same case second appeal, 156 S. W. 532; *Jumper v. Sovereign Camp Woodmen of the World,* 127 Fed. 635, C. C. A. 361; *Kaminski v. Great Camp Knights, etc.,* 146 Mich. 16, 109 N. W. 33. The latter case seems to be based largely, if not entirely, upon the language of the laws of the parent organization, to which the candidate in his application agreed to be bound; specifically providing that the subordinate tent and the officers thereof should be the agent of the applicant, and that the parent organization would not be liable for any negligence on the part of the subordinate tent or any of its officers. That case therefore is of little service on this appeal. The case of *Jumper v. Sovereign Camp,*

*supra,* is commented upon by the New York court in *Thompson v. Supreme Tent, supra;* and attention is directed to the fact that much stress seems to be laid, in the opinion, upon the fact that it did not appear but that the subordinate lodge was a separate and distinct corporation, a distinct legal entity from that of the Sovereign Camp. A reading of the opinion seems also to disclose that the proof in reference to the laws of the order, there under consideration, and the power and authority thereof, were very meager.

The case of *Grand Temple v. Johnson, supra,* from the Court of Civil Appeals of Texas, more completely supports the contention of counsel for appellant, and the opinion rendered on the first appeal comments upon and distinctly repudiates the case of *Mitchell v. Leech, supra.* We have examined the former case with a great deal of care, but the opinion does not, to our minds, appear so persuasive as to cause us to follow in its wake. On the second appeal of the same cause the court did not pass upon the question as to whether the defendant was entitled to affirmative instructions from the court, but reversed the cause for the refusal of a certain charge asked by the defendant; and the opinion on the second appeal would indicate that the cause was to be submitted to the jury for determination. Here the language used by that court on the first appeal would seem to indicate, as previously stated, that it supports the contention of counsel for appellant in the instant case; yet there is argument for a differentiation of the two cases, in that, in the Texas case the defense seemed to largely rest upon the insistence that the injury to the plaintiff was caused by the unauthorized act of an individual in the lodge, acting upon his own initiative to accomplish his own pleasure or malicious purposes.

Whatever may be said, however, by way of comment, upon the cases above cited, relied upon by counsel for appellant, we have reached the conclusion that the opinion of the South Carolina Supreme Court in *Mitchell v. Leech, supra,* is well founded and correct.

We have of course been impressed with the importance of the question here under consideration as to organizations of this character, as argued by counsel for appellant, but we are clearly convinced that the question of agency, and that of liability of the appellant, was properly submitted for the jury's determination.

(5) We have referred herein to the fact that appellant has established, in the state of Illinois, a home for the orphans and

widows of the members of the order, for the maintenance of which each member of the order pays $1 per year. It is urged by appellant's counsel that appellant is in fact a charitable organization, and that as such it is exempt from liability for the torts of its agent. It is to be noted, also, that the intestate was merely a candidate for membership in the order, neither seeking nor receiving charity of the appellant. The question here insisted upon was fully considered by this court in the recent case of *Tucker v. Mobile Infirmary Association,* 191 Ala. 572, 68 South. 4, L. R. A. 1915D, 1167, and determined adversely to the insistence here made. We enter into no discussion of the question here, but content ourselves with reference to that case.

(6) Much argument of counsel in his supplemental brief is devoted to the sufficiency of the complaint. This assignment of error is not discussed in the original brief, upon which the submission was had, and therefore comes too late for consideration, as under the well-established rule of this court, the additional brief must be in support of the assignments of error urged in the brief required to be filed as a prerequisite to the submission of the cause.—*Jebeles-Colias Conf. Co. v. Booze,* 181 Ala. 456, 69 South. 12.

The questions which we have here discussed are those which are treated as of prime importance on this appeal. Other assignments of error were given but scant attention in the original brief, but some few of them are treated more fully in the supplemental brief. We do not consider that these require separate treatment here. Suffice it to say, they have been by us given due consideration, and we find in them nothing which, in our opinion, calls for a reversal of the cause.

With the question of the liability of the local lodge and members thereof, who engaged in this particular initiation resulting in the death of the intestate, we are not concerned, as the action of the lower court excluded those defendants from further consideration in the case, which action we are not on this appeal called upon to review.

It results that the judgment of the court below will be affirmed.

Affirmed.

ANDERSON, C. J., and MCCLELLAN and SAYRE, JJ., concur.