JOHN T. DAVIES; BILLIE J. DAVIES; AND PAMELA J. DAVIES, APPELLANTS, v. CHARLES BUTLER; BRENT ESPIL; PAWL HOLLIS; GARY JOHNSON; JERRY LAZARRI; STEVEN RAHBECK; MICHAEL SALLEE; EMERY AGEE SMITH; THOMAS J. WOOLDRIDGE; THE SUNDOWNERS, AN UNINCORPORATED ASSOCIATION; ET AL., RESPONDENTS.

No. 9964

November 13, 1979 · · · · · · · · · · · · · · · · · · · · · · · · 602 P.2d 605

[Rehearing denied February 7, 1980]

*Peter Chase Neumann,* Reno, for Appellants.

*Wait, Shamberger, Georgeson & McQuaid,* Reno, for Respondents.

## OPINION

By the Court, MOWBRAY, C. J.:

Appellants John T. and Billie J. Davies brought this action against the Sundowners, a voluntary unincorporated club, and nine of its members to recover damages for the death of their son, John, who died during his initiation to the club.[1] The jury found in favor of the respondents and against the Davies. The Davies have appealed from the judgment entered thereon and from the district court's order denying their motion for a judgment notwithstanding the verdict or a new trial. We reverse and remand for a new trial.

## THE FACTS

In their wrongful death action, the Davies claimed that their son, John Davies, died of alcoholic poisoning resulting from the negligence, gross negligence and wanton or reckless conduct of the respondents, the Sundowners, a voluntary unincorporated association, and nine of its individual members, during the club's initiation ceremonies in October, 1975. The Davies charged that the defendants caused to be administered to their son excessive and unreasonably dangerous amounts of alcohol, and that they subjected him to physical and mental abuse which resulted in his death. The defendants, respondents herein, denied wrongful conduct on their part. They claimed as affirmative defenses that John's negligence, gross negligence and recklessness contributed to his death, and that he had assumed the risk of what occurred.

The club known as the Sundowners is a social "drinking club" which sponsors various activities in conjunction with extra-curricular events at the University of Nevada, Reno. The

[1]The complaint also contained counts of assault and battery, which were abandoned by appellants, and a complaint by the decedent's sister, Pamela J. Davies, for infliction of emotional distress, which is not a subject of this appeal.

club's treasury is funded by these activities, most of which are held in connection with its initiation ceremonies.

There was a general agreement among the witnesses at the trial as to the chronology of events preceding Davies' death. On Thursday morning, October 9, 1975, Davies and four others were informed of their selection as initiates. From that time until Saturday night, initiates were directed to participate in morning, afternoon and evening activities, all of which were focused on their ability to consume alcoholic beverages. By Saturday evening, one of Davies' fellow initiates described himself as physically and mentally "exhausted".

On Saturday evening, October 11, 1975, the initiates were instructed to report to the Little Waldorf Saloon in Reno. At midnight, on a given signal by the club president, respondent Lazarri, the initiates were taken outside to a parking lot and lined against a wall. There the "final ceremony" commenced. The five initiates, including Davies, were given and admonished to drink large quantities of alcohol, including 190 proof "Everclear", within a 20 to 30 minute period. After they had consumed the liquor, the initiates were instructed to climb into the open bed of a pickup truck. The three active members of the club who were accompanying the initiates testified that they made two brief stops, then drove some 40 to 50 miles from Reno to a point near Pyramid Lake. There it was discovered that Davies had ceased breathing. The respondents who were present and Davies' fellow initiates testified that they attempted mouth to mouth resuscitation but without success. They then sped back to Reno. Enroute they ran out of gas. An ambulance was called, and Davies eventually was taken to the nearest hospital, where he was pronounced dead. A second initiate was also admitted and treated for alcoholic poisoning at the hospital when it was discovered that he had also become unconscious. He was, however, successfully revived with the assistance of an artificial respirator.

The club's president during the relevant period, respondent Lazarri, testified at trial that all members of the club, including each of the nine named respondents, had an equal voice in its governance, including disposition of treasury funds, and that they each benefitted from its fund-raising activities. According to Lazarri's recollection, each of the nine named respondents was present at the meeting when the initiation ceremonies of October, 1975, were planned.

Each respondent also testified that he either was at the planning meeting or knew of the initiation, including the plan to have initiates drink on the final evening and then be transported to the desert, but did not voice an objection. Each of the

named respondents admitted being present at some point in that part of the initiation known as the "final ceremony" which preceded Davies' death. With the exception of respondent Hollis, who arrived later to participate in transporting Davies and the other initiates to the desert, all were present during the time that liquor was administered to Davies during the final ceremony and either observed or actively participated in the event.

Several respondents mentioned that the possibility of danger had been discussed among the members of the club, because an initiate the previous year had been taken to the hospital to have his stomach pumped.

Testimony of witnesses regarding the treatment and condition of Davies during the "final ceremony" varied. Davies' sister and two of her friends, who observed the event from a car parked across the street, testified that they saw Davies struck in the stomach and on the head by either respondent Sallee or respondent Johnson. Two of these witnesses testified that they heard the decedent shout out "Stop" in protest.

Three other observers, unconnected with the decedent or the respondents, testified that they saw Davies fall to the ground, where he was kicked and screamed at, and that they then saw him picked up and held against the wall, while a bottle was forced into his mouth. Two of these witnesses testified that Davies definitely appeared unable to stand on his own.[2]

---

[2]Lynn Elmore testified in part:

"Q  Would you now describe exactly what you observed with respect to John Davies?

"A  Yes. I noticed they were holding the bottle in his mouth, and he was very wobbly at the time. And after a few moments went by, he bent over as if he was going to get sick. I thought he was sick, and I thought he was going to bend over and perhaps vomit.

"Q  Did he?

"A  No, he didn't.

"Q  Then—

"A  Then, he stood back up with the help of these two men that were with him. And they placed the bottle back in his mouth. And then, he fell to the ground, and they, the men, yelled at him and kicked him, told him to get up and yelled obscenities and picked him back up and put him back against the wall again. And that is when I left."

Diane Schwall testified in part:

"Q  Would you go on and tell us with respect to John Davies when he was down on the ground what else was being done to him or towards him?

"A  The Sundowners that were kicking him were very angry with him for falling down. And they were kicking him and slapping him.

"Q  Were they speaking any words to him?

"A  Yes, profanity, foul language. They were yelling.

"Q  How was the sound with respect to volume or loudness?

"A  Very loud.

The respondents, however, generally denied that Davies or any other initiate had been struck or kicked, though they admitted that the initiates had been shoved or held up, and verbally hazed, while bottles of liquor were held to their

"Q   So, are you describing the sounds that you heard as being yelling in a loud voice and obscenities?

"A   Yes.

"Q   By the Sundowners towards John Davies?

"A   Yes.

"Q   How long was he down on the ground with the Sundowners yelling at him in four[sic] langauge[sic] and with him being kicked?

"A   Probably about five seconds.

"Q   It was a very short time then?

"A   Yes.

"Q   And, Miss Schwall, what happened following that?

"A   They picked him up and they threw him against the wall and forced a bottle into his mouth.

"Q   All right. Where in relationship to that wall, that outside wall of the Little Waldorf Saloon was John Davies picked up and put against the wall? Was it closer to the sidewalk and the street or was—

"A   It was right between the edge of the building and the door."

Mitchell Unger testified in part:

"Q   Would you describe exactly what you observed with respect to the incident of John Davies being held up?

"A   Well, when we did walk outside, he was being held up and there was two people holding him up, and then pretty quick he looked like he was going to get sick.

"So he started to turn his head and then he fell completely to the ground. And they started yelling at him and stuff like that. And then one guy kicked him, and told him to get up, drink like a man.

"And then they picked him up and held him against the wall again, put a bottle to his mouth so he'd drink.

"Q   Without being specific about the words actually being yelled at him, would you describe generally what was being yelled at John Davies?

"A   Well, they were obscenity words—

"Q   You're a young man and you've heard obscenity on many occasions, I'm certain.

"A   Yes.

"Q   You work on the railroad and there's some pretty rough talk there?

"A   Right.

"Q   What was your reaction to what you heard?

"A   Well, I was very embarrassed, because I was with Lynn, and this kind of talk with another—with a female is kind of embarrassing. I wasn't sure if she heard the words or anything like that.

"Q   Was it after John Davies was on the ground that you saw him being kicked?

"A   Yes.

"Q   And after you saw him kicked while he was on the ground, did you see him up against the wall at any time again?

"A   Yes. We was starting to leave—well, after he did get kicked and then they picked him back up on the—and put him against the wall and then we left."

mouths. Some respondents testified that Davies had been involved in a "scuffle" with respondents Johnson and Sallee while trying to retrieve his hat. Several respondents testified that at the end of the ceremony Davies walked unaided to the waiting truck. Several also testified that they had no way of determining how much alcohol an initiate was actually consuming. Respondent Rahbeck testified that he had previously told the decedent "exactly" what had been involved in his own initiation, including how to "fake" drinking when liquor was poured into his mouth.

The jury, by a six to three vote, returned a general verdict in favor of all defendants. The court subsequently denied plaintiffs' motions for a new trial or, in the alternative, for a judgment notwithstanding the verdict. Appellants contend that reversal and a new trial are mandated by prejudicial errors in the instructions to the jury, the form of the jury verdicts, and certain evidentiary rulings made by the court which we turn to consider.

## THE INSTRUCTIONS

### 1. The Comparative Negligence Statute and Willful or Wanton Conduct

The jury was instructed that "[c]ontributory negligence if any, on the part of the decedent does not reduce any recovery by the plaintiffs John T. Davies or Billie J. Davies against a defendant for an injury caused by misconduct of a defendant if you find that the defendant *intended to inflict harm* upon the decedent." (Emphasis added.) Appellants claim this instruction constituted reversible error and that the trial court should instead have given the following proposed instruction:

> Contributory or comparative negligence of the decedent is not a bar to recovery for any injury or damage caused by the wilful or wanton conduct of a defendant.
>
> Wilful or wanton misconduct is intentional wrongful conduct, done *either* with knowledge that serious injury to another will probably result, *or* with a wanton or reckless disregard of the possible results. (Emphasis added.)

It has long been the rule in this jurisdiction that contributory negligence is not a bar to recovery for injury or damage caused by the willful or wanton misconduct of a defendant. Rocky Mt. Produce v. Johnson, 78 Nev. 44, 369 P.2d 198 (1962); Crosman v. Southern Pac. Co., 44 Nev. 286, 194 P. 839 (1921). Respondents contend that with the passage of the comparative

negligence statute, NRS 41.141[3], the legislature intended that henceforth the willful or wanton misconduct of a defendant should simply be compared with the contributory negligence of a plaintiff. Appellants, on the other hand, contend that, since the statute does not mention willfull or wanton misconduct, there is no basis for concluding that the legislature intended to change the previous rule. We agree with the appellants that, read in light of our previous decisions carefully delineating the concepts of *willful* and *wanton misconduct,* the legislature intended to leave such behavior outside the purview of the comparative negligence statute.

Nevada's applicable comparative negligence statute, 41.141(1), provided that "[i]n any action to recover damages for injury to persons or property in which contributory negligence may be *asserted as a defense, the* contributory negligence of the plaintiff shall not bar a recovery if the negligence of the person seeking recovery was not greater than the negligence *or gross* negligence of the person or persons against whom recovery is sought, but any damages allowed shall be diminished in

---

[3]NRS 41.141 read, at the time of the injury and trial herein:

"1.   In any action to recover damages for injury to persons or property in which contributory negligence may be asserted as a defense, the contributory negligence of the plaintiff shall not bar a recovery if the negligence of the person seeking recovery was not greater than the negligence or gross negligence of the person or persons against whom recovery is sought, but any damages allowed shall be diminished in proportion to the amount of negligence attributable to the person seeking recovery.

"2.   In such cases, the judge may, and when requested by any party shall instruct the jury that:

"(a) The plaintiff may not recover if his contributory negligence has contributed more to the injury than the negligence of the defendant or the combined negligence of multiple defendants.

"(b) If the jury determines the plaintiff is entitled to recover, it shall return by general verdict the total amount of damages the plaintiff would be entitled to recover except for his contributory negligence.

"(c) If the jury determines that a party is entitled to recover, it shall return a special verdict indicating the percentage of negligence attributable to each party.

"(d) The percentage of negligence attributable to the person seeking recovery shall reduce the amount of such recovery by the proportionate amount of such negligence.

"3.   Where recovery is allowed against more than one defendant in such an action:

"(a) The defendants are severally liable to the plaintiff.

"(b) Each defendant's liability shall be in proportion to his negligence as determined by the jury, or judge if there is no jury. The jury or judge shall apportion the recoverable damages among the defendants in accordance with the negligence determined."

The statute has subsequently been amended. *See* 1979 Nev. Stats. ch. 629 § 6, at 1356-57.

proportion to the amount of negligence attributable to the person seeking recovery.'' (Emphasis added.)

Appellants concede that gross negligence by the defendants, if proved, is subject, under the statute, to comparison with decedent's negligence. They contend, however, that willful or wanton misconduct, like conduct intended to cause harm, was not intended to be and should not be made subject to the defense of contributory negligence by the operation of the statute.

This court has consistently distinguished the concepts of ordinary or gross negligence from the concepts of willful or wanton misconduct.

> Gross negligence is manifestly a smaller amount of watchfulness and circumspection than the circumstances require of a prudent man. But it falls short of being such reckless disregard of probable consequences as is equivalent to a wilful and intentional wrong. *Ordinary and gross negligence differ in degree of inattention, while both differ in kind from wilful and intentional conduct which is or ought to be known to have a tendency to injury.*

(Emphasis added.) Hart v. Kline, 61 Nev. 96, 101, 116 P.2d 672, 674 (1941). ''Wanton misconduct involves an intention to perform an act that the actor knows, or should know, will very probably cause harm.'' Rocky Mt. Produce v. Johnson, *supra,* 78 Nev. at 51–52, 369 P.2d at 202. This court has also said: ''To be wanton such conduct must be beyond the routine. There must be some act of perversity, depravity or oppression.'' Bearden v. City of Boulder City, 89 Nev. 106, 110, 507 P.2d 1034, 1036 (1973). In light of these decisions, it is clear that the legislature, by the use of the term ''gross negligence'', could not have contemplated that the term would include the distinct concepts of willful or wanton misconduct. *See* Draney v. Bachman, 351 A.2d 409 (N.J.Super. 1976). In the absence of a clear legislative directive, we decline to abrogate the long-standing rule that mere negligence on the part of a plaintiff will not constitute a defense to the wanton or willful misconduct of a defendant. *See* Ryan v. Foster & Marshall, Inc., 556 F.2d 460 (9th Cir. 1977).

As respondents have pointed out, courts in several other jurisdictions have reached a different conclusion. We are not persuaded that the results reached apply to the interpretation of the statute before us. In Li v. Yellow Cab Company, 532 P.2d 1226, 1241 (Cal. 1975), the Supreme Court of California

announced, by way of dictum, that henceforth both gross negligence and willful or wanton misconduct would be subject to comparative negligence. The California court, however, having adopted comparative negligence by judicial decision, was not faced, as we are, with the problem of determining legislative intent.

In Billingsley v. Westrac Company, 365 F.2d 619 (8th Cir. 1966), the court, applying Arkansas law, concluded that "willful and wanton negligence", as used by the Arkansas courts, amounted in fact to gross negligence and should therefore be subjected to comparative negligence analysis in order to avoid thwarting the purpose of the statute. In Bielski v. Schulze, 114 N.W.2d 105 (Wis. 1962), also cited by respondents, the court explicitly dealt only with the concept of gross negligence. As noted in *Bielski, id.* at 113, "[m]uch of what constituted gross negligence will be found to constitute a high percentage of ordinary negligence causing the harm." The conclusion we reach today is consistent with the approach taken by these courts. It is clear that the legislature, by specifically including gross negligence in the terms of the comparative negligence statute, intended to subject such conduct to comparison with a plaintiff's contributory negligence. We agree that conduct amounting to gross negligence should be subject to such comparison in order to be consistent with the legislative purpose. In light of our prior decisions defining willful and wanton misconduct, however, we find it equally clear that such conduct is *not* equivalent to gross negligence.

As noted by V. Schwartz, *Comparative Negligence* § 5.3 (1974), to the extent that the concepts of willful and wanton misconduct or gross negligence were instituted merely to ameliorate the hardships of the contributory negligence rule, the rationale no longer applies under comparative negligence, but to the extent that they reflect a judgment that the defendant's culpability "is so close to intentional wrongdoing that he should not have the benefit of contributory negligence," the basis for the rule is unchanged by a comparative negligence system. We conclude that the legislature, by including the term "gross negligence" in the comparative negligence statute, has made a determination that the concept of gross negligence is comparable to and subject to comparison with ordinary negligence, but has left the law unchanged with regard to conduct in which the defendant's culpability more closely approaches that of one who intentionally inflicts damage.

The evidence in the instant case supports an instruction regarding the willful or wanton misconduct of the respondents. The jury could conclude that the intent of respondents was to administer dangerous quantities of alcohol to Davies within a short period of time. 190 proof alcohol was deliberately chosen to be administered, as it had been on previous occasions, and respondents were fully aware of its nature. Further, they were aware that retention of large amounts of alcohol in the system can be highly dangerous, as an initiate had had to be hospitalized the year before. Despite respondents' protestation that they assumed decedent would not swallow most of the alcohol administered to him, they admitted having no way to determine whether that was so, while continuing to put bottles of liquor to his lips and screaming at him to drink it. Other courts have had no difficulty finding willful, wanton, or reckless misconduct in the furnishing of alcohol in sufficient quantities to cause death, even under less aggravated circumstances. *E.g.,* Ewing v. Cloverleaf Bowl, 572 P.2d 1155 (Cal. 1978); McCue v. Klein, 60 Tex. 168 (1883).

We find that the comparative negligence statute was not intended to abrogate the rule that contributory negligence is no defense to willful or wanton conduct, and that the refusal to give the requested instruction was reversible error.

## 2. The Consent of the Decedent

The trial court instructed the jury, over appellants' objection, that "[a] person may expressly or by voluntarily participating in an activity consent to an act which would otherwise be a battery." In the context of this case, the giving of this instruction was reversible error.

As appellants point out, they had abandoned their claim of assault and battery, and the instruction was therefore irrelevant to any material issue in the case. The jury, however, would be entitled to assume that the instruction was relevant, and to use it in their assessment of decedent's degree of responsibility for his resulting death. The jury may well have deduced from this instruction that one who voluntarily participates in an activity in legal contemplation assumes the risk of all negligent or intentional conduct by others. After all, "[s]ince under our jury system, the jury does not have the function of deciding questions of law, the primary purpose of instructions must be to inform the jury, as triers of facts, what fact issues are to be favorably decided to reach each possible verdict." Stanich v. Western Union Tel. Co., 153 S.W.2d 54, 56 (Mo. 1941).

Further, in the context of this case, the instruction was so incomplete as to be misleading. "To be effective, consent must be (a) by one who has the capacity to consent . . . and (b) to the particular conduct, or to substantially the same conduct." 4 Restatement (Second), Torts § 892A, at 364 (1979). As this court has held, consent is not effective as a defense to battery "where the beating is excessively disproportionate to the consent, given or implied, or where the party injured is exposed to loss of life or great bodily harm." Wright v. Starr, 42 Nev. 441, 446, 179 P. 877 (1919). Furthermore, capacity to consent requires the mental ability to appreciate the "nature, extent and probable consequences of the conduct consented to." Restatement, Torts, *supra,* comment b, at 365. As noted by Prosser, *Law of Torts,* § 18, at 102 (4th ed. 1971), "[i]f the plaintiff is known to be incapable of giving consent because of . . . intoxication . . . his failure to object, or even his active manifestation of consent will not protect the defendant."

In McCue v. Klein, *supra,* the widow of a man who had died as a result of drinking a toxic quantity of alcohol sued those who had furnished him the alcohol and induced him to drink it, on a wager. The court held, 60 Tex. at 169,

> [T]he maxim of *volenti non fit injuria* presupposes that the party is capable of giving consent to his own injury. If he is divested of the power of refusal by mental faculties, the damage cannot be excused on the ground of consent given. A consent given by a person in such condition is no consent at all,—more especially when his state of mind is well known to the party doing the injury. . . . And so if one whose mental faculties are suspended by intoxication is induced to swallow spiritous liquors to such excess as to endanger his life, the persons taking advantage of his condition of helplessness and mental darkness and imposing the draught upon him must answer to him if such injury should fall short of the destruction of life, and to his family if death should be the result.

We conclude that "in view of all the circumstances the instruction may have misled the jury, and it should not have been given." Zelavin v. Tonopah Belmont, 39 Nev. 1, 7, 149 P. 188, 189 (1915).

### 3. The "Intoxication Is No Excuse" Instruction

The court instructed the jury, over appellants' objection that "[i]ntoxication is no excuse for failure to act as a reasonably prudent person would act. A person who is intoxicated or

under the influence of intoxicating liquor is held to the same standard of care as a sober person."

While ordinarily the statement is an accurate summary of the law, the courts have refused to apply the basic rule strictly, at least as to the inebriate's duty to protect himself, if "when the liquor was furnished [plaintiff's decedent] was incapable of acting like a reasonable man." Hoyt v. Tilton, 128 A. 688, 690 (N.H. 1925). *Cf.* De Martini v. Alexander Sanitarium, Inc., 13 Cal.Rptr. 564 (Cal.App. 1961).

The rule is also subject to certain exceptions which the jury may have found applicable in this case. The Restatement (Second) of Torts, 2, § 283C, at 18 (1965), provides that "[i]f the actor is ill or otherwise physically disabled, the standard of conduct to which he must conform to avoid being negligent is that of a reasonable man under like disability."

Where intoxication is involuntary, such as in the "highly unusual case in which one believes that he is drinking tea is plied with liquor, and so becomes disabled," the standard of conduct to which the actor must conform is that of a reasonable man under a like disability. Restatement (Second), Torts, *supra,* at 19.

> Where, however, the intoxication is voluntary, or where it results from deliberate drinking with knowledge of what is being consumed, so that the result is deliberately risked, the policy of the law has refused to make any allowance for the resulting disability, and the rule stated in this Section is not applied. Such intoxication does not excuse conduct which would otherwise be negligent. *Id.*

This explanation of the standard of conduct required of an intoxicated person illustrates the misleading nature of the unqualified instruction given to the jury. There was evidence in this case from which the jury could have concluded that at some point decedent's further drinking was "involuntary", and no longer "deliberate drinking with knowledge of what is consumed, so that the result is deliberately risked."

The instruction "practically takes from the consideration of the jury the [plaintiffs'] theory of the case", i.e., that decedent did not *voluntarily* consume a lethal dose of alcohol, and thus it was prejudicial error. Zelavin v. Tonopah Belmont, *supra,* 39 Nev. at 10.

### 4. The "Last Clear Chance" Instruction

Appellants requested a "last clear chance" instruction, informing the jury that if they determined that the decedent

had, by his own negligence, placed himself in a position of danger, from which he was unable to escape or of which he was unaware, and thereafter defendants either saw or should have seen the danger and could have avoided injury to the decedent by the exercise of ordinary care, but failed to do so, "then you must find against the defense of comparative negligence, because under such conditions the law holds the defendants liable for any injury or damage suffered by the plaintiff's decedent and proximately resulting from the accident, despite the negligence of the plaintiff's decedent." The trial court properly refused to give the instruction, on the ground that it was inappropriate under Nevada's comparative negligence statute.

The traditional legal rationale for the application of the doctrine of last clear chance was that the plaintiff had ceased to be "actively negligent", and the subsequent negligence of the defendant was therefore, as a matter of law, the "sole" proximate cause of the injury. *See* Weck v. Reno Traction Co., 38 Nev. 285, 296–97, 149 P. 65, 68 (1915). This rationale has been criticized as "quite out of line with modern ideas of proximate cause." W. Prosser, *supra,* § 66, at 427. Indeed, it is not consistent with the rationale applied by this court in other consecutive negligence situations. *See, e.g.,* Drummond v. Mid-West Growers, 91 Nev. 698, 704–5, 542 P.2d 198, 203 (1975) (subsequent negligence of a third party toward rescuer of negligent defendant foreseeable; defendant's negligence remains proximate cause).

Most courts which have considered the issue in recent years have agreed, concluding that the doctrine, as a device for assigning sole responsibility for an injury to the defendant, though both defendant and plaintiff are negligent, should not survive under a system of comparative negligence. *E.g.,* Kaatz v. State, 540 P.2d 1037 (Ala. 1975); Li v. Yellow Cab Company, *supra;* Burns v. Ottati, 513 P.2d 469 (Colo.App. 1973); Seaboard Coast Line Railroad Co. v. Daugherty, 164 S.E.2d 269 (Ga.App. 1968); Cushman v. Perkins, 245 A.2d 846 (Me. 1968). We agree.

The trial court committed no error in refusing to give the "last clear chance" instruction as requested by appellants.

### 5.   The Res Ipsa Loquitur Instructions

Appellants requested two res ipsa loquitur instructions which were properly rejected by the trial court.

As this court stated in Hospital Ass'n v. Gaffney, 64 Nev. 225, 234–35, 180 P.2d 594, 599 (1947), the doctrine of res ipsa

loquitur "is an exception to the general rule that negligence is not to be presumed, but must be affirmatively proved," and

> [t]he inference which the doctrine permits is grounded upon the fact that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to the defendant but inaccessible to the injured person. If the circumstances do not suggest or indicate superior knowledge or opportunity for explanation on the part of the party charged, or if the plaintiff himself has equal or superior means of information, the doctrine will not apply.

We find nothing in the circumstances of this case, other than the fact that the decedent was unavailable to testify, which would justify bringing the doctrine into play in this case. Non-defendant observers were present at every point in the events leading to the death of the decedent, and were fully available to testify. Since we are unwilling to extend the doctrine so as to apply it to virtually every wrongful death action, we therefore uphold the trial court's determination in this instance.

### 6. The "Negligence Per Se" Instruction

Appellants asked that the jury be instructed that violation by the defendants of a Reno municipal ordinance, prohibiting the sale or furnishing of alcoholic beverages to any person actually or apparently under the influence of alcoholic beverages, would constitute negligence as a matter of law.

In Hamm v. Carson City Nugget, Inc., 85 Nev. 99, 450 P.2d 358 (1969), we considered carefully the policy considerations involved in imposing civil liability upon one who sells liquor to a person who is drunk, on the basis of a similar prohibitory state statute. We concluded then that in the absence of evidence of legislative intent to impose such liability, we would decline to hold that violation of such a statute is negligence per se.

Our ruling in *Hamm* is dispositive here. The trial court correctly rejected appellants' proposed instruction.

## THE EVIDENTIARY RULINGS

We have examined the record and determine that appellants' claims that the trial court committed reversible error in refusing to admit certain evidence are without merit.

Appellants offered photographs showing other initiates and one of the respondents taken at an event which preceded the

"final ceremony", as well as the death photograph of the decedent. The court refused to admit them as each had little probative value. The ruling was correct. NRS 48.035(1). Appellants' offer of proof regarding certain unattributed statements made regarding liquid on decedent's clothes did not meet the foundational requirements for an "admission by silence", as there was no showing that the remarks were made to, or in the hearing of, any defendant. Greenberg v. Stanley, 153 A.2d 833 (N.J. 1959); Creager v. Chilson, 453 S.W.2d 941 (Mo. 1970). The unattributed statement in the medical records of decedent's co-initiate regarding the source of the liquid was also properly excluded. Mikel v. Flatbush General Hospital, 370 N.Y.S.2d 162 (N.Y.App. 1975); Dorsten v. Lawrence, 253 N.E.2d 804 (Ohio App. 1969).

We do not address appellants' remaining contentions, relevant to the issue of the respective liability of each of the respondents, since that issue was never reached by the jury.

For the reasons hereinabove set forth, we conclude that we must reverse the order of the district court denying appellants' motion for a new trial and remand the case to the lower court for that purpose.

MANOUKIAN, J., and FONDI, D. J[4]., concur.

BATJER, J., dissenting:

I respectfully dissent from the opinion filed by the majority.

I do not believe the trial court erred when it instructed the jury that "[c]ontributory negligence, if any, on the part of the decedent does not reduce any recovery by the plaintiffs John T. Davies or Billie J. Davies against a defendant for an injury caused by misconduct of a defendant if you find that the defendant intended to inflict harm upon the decedent" instead of giving the instruction proposed by appellants.[1] Although the proposed instruction is semantically more desirable, both convey the message that the plaintiffs' recovery should not be reduced if the injury to the decedent resulted from the intentional wrongful conduct of the defendants.

---

[4]The Governor, pursuant to Nev. Const. art. 6, § 4, designated the Honorable Michael E. Fondi, Judge of the First Judicial District, to sit in place of THE HONORABLE GORDON THOMPSON, Justice, who was disqualified.

[1]"Contributory or comparative negligence of the decedent is not a bar to recovery for any injury or damage caused by the wilful or wanton conduct of a defendant.

"Wilful or wanton misconduct is intentional wrongful conduct, done either with knowledge that serious injury to another will probably result, or with a wanton or reckless disregard of the possible results."

Furthermore, I do not agree that the trial court erred in giving the instruction that "[i]ntoxication is no excuse for failure to act as a reasonably prudent person would act. A person who is intoxicated or under the influence of intoxicating liquor is held to the same standard of care as a sober person". It correctly and fairly states the law. If appellants believed it to be overbroad in its application to the facts of this case, a counter-vailing instruction should have been offered.

Although the giving of the instruction that "[a] person may expressly or by voluntarily participating in an activity consent to an act which would otherwise be a battery" might be error in the context of this case, the giving of that instruction was harmless. NRCP 61.[2]

I concur with the remainder of the majority opinion which rejects the other assignments of error. The appellants received a fair and thorough trial upon their cause of action and the jury verdict should not be set aside upon narrow technical grounds which arguably can be decided either way. I would affirm.

GUNDERSON, J., concurs.

---

[2]NRCP 61:

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."