0824

Sanford Ray BALLOU, Administrator of the Estate of Lurie Barry Ballou, Respondent v. SIGMA NU GENERAL FRATERNITY and Maurice Littlefield, Defendants, of whom Sigma Nu General Fraternity is the Appellant.

(352 S. E. (2d) 488)

Court of Appeals

*James W. Alford,* and *R. Lewis Johnson, Barnes, Alford, Stork & Johnson,* Columbia, *for appellant.*

*D. Kenneth Baker* and *Olin L. Purvis, III* of *Baker & Purvis, P. A.,* Darlington, *for respondent.*

Heard Oct. 13, 1986.

Decided Dec. 1, 1986.

GOOLSBY, Judge:

In this action for wrongful death, the appellant Sigma Nu General Fraternity (Sigma Nu), an unincorporated association, appeals from a jury verdict in favor of the respondent Sanford Ray Ballou (Ballou), the administrator of the estate of his son, Lurie Barry Ballou (Barry). We affirm.

The questions on appeal relate to (1) the sufficiency of the

evidence as to failure to exercise due care; (2) the sufficiency of the evidence as to proximate cause, (3) the sufficiency of the evidence as to the scope of the agency relationship between Sigma Nu and its local chapter at the University of South Carolina, (4) the admission of certain expert testimony, (5) the trial judge's failure to charge the Good Samaritan Act, (6) the applicability of the charge as to last clear chance, (7) the trial judge's failure to grant a mistrial on the basis of statements made by counsel during opening argument, and (8) the sufficiency of the evidence to support an award of punitive damages.

Barry pledged the local chapter of Sigma Nu at the University of South Carolina during the 1979 fall semester. He remained a pledge throughout the fall semester.

Sigma Nu's pledging process at the University traditionally ended the first week of the spring semester, a week referred to by pledges and active brothers alike as "hell week." An informal initiation party called "hell night" concluded hell week. Attendance at hell night was mandatory for all pledges.

The local chapter scheduled its hell night for the evening of January 24, 1980, and told its pledges, nineteen in all, to be at the fraternity lounge at a certain hour. The pledges understood, according to Sigma Nu pledge James Graham, that they "would be pretty much expected to do a good bit of drinking." Indeed, Barry himself expected to get "bombed."

Before leaving to participate in hell night, Barry ate a large dinner at his apartment.

Barry and Graham arrived at the fraternity house between 8:00 and 9:00 o'clock and met with the other pledges in an upstairs room where they remained for approximately fifteen to forty minutes.

From the upstairs room, the pledges went downstairs into a lounge area of the fraternity house. There, an active brother told all of the pledges to strip down to their underwear and to line up.

Active brothers then led the pledges one by one into the fraternity's barroom. Once inside, an active brother asked the pledge a question. After the pledge answered it, an active brother handed him, as described by Graham, a "goblet-shape[d]," "trophy-type cup" called the "cup of

truth." It contained an unknown mix of intoxicating liquids of undisclosed alcoholic strength.

The pledge, Graham testified, was "expected to chug a certain portion" of the cup of truth's contents. Sometimes, the active brothers applauded if a pledge drunk all the liquid in the cup; however, if he drank only a small amount, the active brothers ridiculed him or "poked fun" at him.

As additional pledges were led into the barroom, other active brothers seated the pledges who had been examined and had drunk from the cup of truth against the wall in another room. The active brothers gave the pledges bottles of beer, wine, or liquor and asked them to drink it. They also passed around for the pledges' consumption what appeared to be cans of soft drinks. The cans actually contained more alcohol.

At one point, Graham was handed a bottle of bourbon and refused to drink it. An active brother, however, insisted that he do so. When Graham drank only a small amount, the active brother suggested that "maybe [Graham] was a wimp" or he questioned Graham's "masculinity."

Thereafter, when all the pledges were together, active brothers shook cans of beer and soft drinks and sprayed the pledges as they sat in a circle on the floor, sang fraternity songs, and consumed additional alcohol given them by active brothers. One song that they sang, entitled "I Drink to Sigma Nu" and taken from the *Legion of Honor*, a Sigma Nu publication, urged, "Drink! Drink! Drink! Men brave and true. Drink! Drink! Drink! To our Sigma Nu."

Following this, active brothers required the pledges to play games called "flood" and "air raid." These games required the pledges either to stand on their tip toes or to fall to the floor, now soaked with soft drinks, beer, wine, and liquor.

When all the pledges were wet, active brothers required the pledges, who were still clad in their underwear, to run to another fraternity house nearby where a party attended by coeds was being held.

The pledges subsequently returned to Sigma Nu's house. By now, most of them, Barry included, were very intoxicated. In fact, Barry vomited "right outside the front door" to the fraternity house.

Several pledges then went upstairs and soaped and wet down a hallway. For about fifteen minutes, they slid up and down it.

By 10:30 p.m., Barry and three other pledges had passed out. Barry lay on a couch in the fraternity lounge.

Graham and three active brothers checked on Barry shortly before midnight. Barry's pale color and his lack of responsiveness concerned them.

Although the four discussed taking Barry to the infirmary, they left him lying face down and unconscious on the couch. A pledge who lived in the fraternity house placed Barry in this position because he feared Barry, if he remained on his back, might vomit and suffocate.

The following morning an active brother found Barry dead. An autopsy revealed that he died from "acute alcohol intoxication with terminal aspiration of [his] gastric contents." His blood-alcohol level read 0.46%. He was 20 years old.

Investigating officers discovered numerous whiskey bottle caps, beer cans, and wine bottles inside the fraternity house. They found broken liquor bottles outside the building.

Had Barry been removed to the infirmary or to a hospital, the higher level of treatment that would have been available would have afforded a greater "potential for success" in preventing Barry from aspirating his gastric contents.

Barry's father subsequently filed this action against Sigma Nu and its executive director, Maurice Littlefield. Among other things, Ballou alleged that his son "was forced by harassment and psychological manipulation to consume enormous quantities of alcoholic beverages."

The trial court dismissed Littlefield as a party defendant at the end of Ballou's case. The jury returned a verdict against Sigma Nu in the amount of $200,000 actual damages and $50,000 punitive damages.

## I.

Sigma Nu contends that the record contains no evidence of actionable negligence on its part and that the trial judge, therefore, committed error in denying its motion for judgment notwithstanding the verdict.

■ The duty of exercising care to protect another person against injury may be created by contract or by operation of law. *See Griffin v. Blankenship*, 248 N. C. 81, 102 S. E. (2d) 451 (1958). A statute is not always required for the duty to arise by operation of law. *Rice v. Turner*, 191 Va. 601, 62 S. E. (2d) 24 (1950). The duty may result from the relation of the parties. *Id.* "Whether the relation between two persons is such as gives rise to duty to use care is a pure question of law for the court to determine." 57 Am. Jur. (2d) *Negligence* § 36 at 384 (1971).

In South Carolina, our Supreme Court has determined that a fraternal organization owes a duty of care to its initiates not to cause them injury in the process. *See Easler v. Hejaz Temple of Greenville*, 285 S. C. 348, 329 S. E. (2d) 753 (1985) (wherein the court viewed the manner in which an unincorporated association conducted part of its initiation ceremonies as hazardous and constituting actionable negligence).

In determining whether a motion for judgment notwithstanding the verdict should be granted, the evidence and all reasonable inferences that can be drawn therefrom must be considered in the light most favorable to the party opposing the motion and most strongly against the party making it. *Ellison v. Pope*, 290 S. C. 100, 348 S. E. (2d) 367 (Ct. App. 1986). The motion should be refused if more than one reasonable inference can be drawn from the evidence. *Id.*

■ When the evidence here and all its reasonable inference are so viewed, a jury issue concerning the question of actionable negligence clearly appears.

The evidence reasonably suggests that Sigma Nu required Barry to attend hell night as part of its initiation process and that on hell night Sigma Nu through its active brothers created a hazardous condition by hazing him and the other pledges, plying them with dangerous quantities of alcoholic liquors and beverages over a short period of time, and pressuring them to consume these intoxicants to excess. *See Davies v. Butler*, 95 Nev. 763, 602 P. (2d) 605 (1979) (wherein the court held that the evidence supported an instruction regarding the willful or wanton misconduct of the respondent social "drinking club" where the jury could conclude that the club's intent was to administer dangerous

quantities of alcohol to the decedent within a short period of time); *Ibach v. Jackson*, 148 Or. 92, 111, 35 P. (2d) 672, 680 (1934) (wherein the court held that the administration of alcohol by one person to another "in such quantities as to cause death, is a breach of duty and a tortious act....").

The evidence reasonably suggests also that, after Barry became helplessly drunken as a result of consuming an excessive amount of the alcohol so furnished him, members of Sigma Nu became aware of his perilous condition but did not afford him the assistance his condition demanded. *See Ibach v. Jackson*, 148 Or. at 111, 35 P. (2d) at 680 ("[T]he abandonment of a guest who had been maimed and injured after having been made helplessly drunken by her host is another breach of duty."); W. PROSSER AND W. KEETON, THE LAW OF TORTS § 56 at 377 (5th ed. 1984) ("[I]f the defendant's own negligence has been responsible for the plaintiff's situation, a relation has arisen which imposes a duty to make a reasonable effort to give assistance, and avoid any further harm."); 65 C.J.S. *Negligence* § 63(104) at 857 (1966) ("One whose negligence or fault has resulted in an injury to another is under a legal duty, if there be necessity therefor, to care for such other and afford him such assistance and relief as his condition demands.").

## II.

Another basis for Sigma Nu's contention that the trial judge erred in denying its motion for judgment notwithstanding the verdict is its argument that the proximate cause of Barry's death was his own voluntary consumption of the alcohol and not the furnishing of it by Sigma Nu's active brothers.

The question of proximate cause is ordinarily a question of fact for determination by the jury. *Player v. Thompson*, 259 S. C. 600, 193 S. E. (2d) 531 (1972). Only in rare or exceptional cases may the question of proximate cause be decided as a matter of law. 65A C.J.S. *Negligence* § 264 at 917 (1966). The particular facts and circumstances of each case determine whether the question of proximate cause is for the court or for the jury. *Id.* at 917-18. If there may be a fair difference of opinion regarding whose act proximately caused the injury, then the question of proxi-

mate cause must be submitted to the jury. *Johnson v. Finney,* 246 S. C. 366, 143 S. E. (2d) 722 (1965).

This case, when the evidence and all its reasonable inferences are viewed in the light most favorable to Ballou, presents a question of fact concerning the issue of proximate cause.

The jury was entitled to find that the purpose for which, the manner in which, and the extent to which the active brothers furnished alcoholic liquors and beverages to Barry and the other pledges proximately caused Barry's death. *See Christiansen v. Campbell,* 285 S. C. 164, 328 S. E. (2d) 351 (Ct. App. 1985), *cert. denied,* Davis' Advance Sheets No. 33 at 2 (Ct. App. July 6, 1985) (wherein the Court of Appeals, relying on *Harrison v. Berkley,* 32 S.C.L. (1 Strob.) 525, 47 Am. Dec. 578 (1847), rejected the argument that the unlawful sale of alcohol to one who is not an ordinary able-bodied person could not be a proximate cause of injuries sustained by the person sold the alcohol).

Ample evidence, both directed and circumstantial, suggests that extreme intoxication was the primary purpose of the active brothers in furnishing the alcohol and that alcohol played a leading, if not the principal, role in the initiation process at the local Sigma Nu chapter. This same evidence indicates that the active brothers did not simply furnish ordinary able-bodied men with a quantity of alcohol and do nothing else; rather, it shows that they throughout the initiation process plied the pledges with alcohol and that they used song, ceremony, ridicule, subterfuge, and peer pressure to induce the pledges to drink excessive amounts of alcohol within a short period of time. *See Wilson v. Steinbach,* 98 Wash. (2d) 434, 441, 656 P. (2d) 1030, 1034 (1982) ("[S]ituations may arise where liability may be appropriate such as ... where extreme intoxication is a primary purpose in supplying liquor."); *Davies v. Butler, supra; Nally v. Blandford,* 291 S. W. (2d) 832 (Ky. 1956) (wherein court held that the unlawful sale of liquor to an intoxicated man with knowledge he had a bet to consume entire quart of liquor was the proximate cause of death); *Ibach v. Jackson,* 148 Or. at 112, 35 P. (2d) at 680 ("To say that the administration of liquor in such large quantities as to cause death is not a breach of the duty which one human

being owes to every other human being ... is to shock the fundamental and rudimentary principles of decency and order.");[1] *McCue v. Klein*, 60 Tex. 168, 169 (1883) ("And so if one whose mental faculties are suspended by intoxication is induced to swallow spirituous liquors to such excess as to endanger his life, the persons taking advantage of his condition of helplessness and mental darkness and imposing the draught upon him must answer in damages for the injury that ensues."). From this evidence, the jury could reasonably infer that without the prompting of the active brothers, Barry would not have consumed a fatal quantity of alcohol within a short period of time. In other words, the jury could reasonably conclude that the conduct of the active brothers was an efficient cause of Barry's death.

Moreover, the jury could find that a proximate cause of Barry's death was the abandonment of him by Sigma Nu members while he was in a state of acute alcohol intoxication brought on by the wrongful act of the active brothers. *See Ibach v. Jackson, supra.* A reasonable inference to be drawn from the evidence is that the failure of Sigma Nu's members to take Barry to a hospital when they realized he was in a perilous condition effectively terminated his chance of survival. *See Coleman v. Shaw*, 281 S. C. 107, 314 S. E. (2d) 154 (Ct. App. 1984) (the issue of proximate cause held inappropriate for summary judgment in a drowning case against a motel pool owner where a man was found dead in the motel pool and the owner, in violation of a safety regulation, did not have on hand a person trained in first aid).

This case is distinguishable from our recent decision in *Garren v. Cummings & McCrady, Inc.*, 289 S. C. 348, 345 S. E. (2d) 508 (Ct. App. 1986). In *Garren*, we held that a social host incurs no liability to a third party when he serves alcohol to an intoxicated adult guest when the host knows the guest intends to drive a motor vehicle and the guest subsequently injures the third party. Here, the action does not involve a third party. Also, there is in this case evidence that the

---

[1] Although the Oregon Court of Appeals states that Oregon has never recognized a common law action in favor of a person or his estate who is injured for his or her own consumption of alcohol, citing *Ibach*, this is a gross misstatement and contradiction of the case's actual holding. *Johnson v. Paige*, 47 Or. App. 1177, 615 P. (2d) 1185 (1980).

party furnishing the alcohol promoted its excessive consumption by the injured party.

Sigma Nu in its argument regarding proximate cause also argues that Barry was contributorily negligent or reckless. The question of contributory negligence or recklessness, like the question of proximate cause, however, is ordinarily a question of fact for the jury. *Davenport v. Walker*, 280 S. C. 588, 313 S. E. (2d) 354 (Ct. App. 1984); *see Cammer v. Atlantic Coast Line R. Co.*, 214 S. C. 71, 51 S. E. (2d) 174 (1948) (the question of contributory gross negligence or willfulness is ordinarily a jury issue). Rarely does the question of a plaintiff's contributory negligence or recklessness become a question for the court to determine. *See Johnson v. Finney*, *supra* (ordinarily, the question of contributory negligence or willfulness is a jury issue and rarely a question of law for the court).

■ Even if we were to assume that Barry was guilty of contributory negligence, there is evidence from which the jury could find, and, as evidenced by its award of punitive damages, did find, that the conduct of the active brothers was willful. Where the conduct of the defendant is willful, the contributory negligence of the plaintiff does not bar him from recovery. *See Jowers v. Dupriest*, 249 S. C. 506, 154 S. E. (2d) 922 (1967) (contributory negligence is not a defense to actionable willfulness).

■ On the question of Barry's contributory recklessness, the evidence permitted the jury to find that Barry exercised reasonable care in the circumstances in which he found himself, that he failed to exercise reasonable care in those circumstances, or that he consumed alcohol in fatal quantities with a conscious disregard for his own life. Because the facts in controversy could support any of these inferences, the question of whether Barry's own conduct was such as to bar Ballou from any recovery was properly submitted to the jury. In layman's terms, the question for the jury to decide was: who was more responsible for Barry's death, Barry himself or those who furnished the alcohol and pressured him to drink?

## III.

Sigma Nu next contends that the trial court should have granted its motion for judgment notwithstanding the verdict because the only reasonable inference to be drawn from all the evidence is that Barry assumed the risk of injury to himself by consuming enormous amounts of alcohol. We disagree.

Like the issue of contributory negligence, the question of whether a party assumed the risk of injury is ordinarily a question of fact to be determined by the jury. *Griffin v. Griffin,* 282 S. C. 288, 318 S. E. (2d) 24 (Ct. App. 1984). The trial court may declare that the plaintiff assumed the risk as a matter of law where it clearly appears either that the plaintiff had knowledge of and appreciated the danger or that the danger was so obvious or apparent that knowledge should have been imputed to him. *Id.*

As we view the evidence in the instant case, Barry voluntarily assumed the risk of the dangers imposed by a situation involving verbal and physical hazing and consumption of alcohol to the point of intoxication; however, he did not as a matter of law freely and voluntarily with full knowledge of its nature and extent incur the risk of the dangers created by Sigma Nu's action of promoting extreme intoxication.

Although Barry may have been aware that he was participating in an activity involving a great deal of drinking, the jury could find from the evidence that at some point Barry's further drinking no longer constituted "deliberate drinking with knowledge of what [was] being consumed, so that the result [was] deliberately risked." RESTATEMENT (SECOND) OF TORTS § 283 C comment d at 19 (1965); *Davies v. Butler, supra.*

## IV.

A further ground for its motion for judgment notwithstanding the verdict is Sigma Nu's assertion that the acts of the active brothers in conducting hell night at Sigma Nu's local chapter at the University were not performed within the scope of local chapter's agency with Sigma Nu.

In its brief, Sigma Nu concedes that an agency relationship existed between it and the local chapter. As Sigma

Nu's agent, the act of the local chapter in conducting hell night was binding upon Sigma Nu if performed within the scope of the agency, even though not authorized by the general fraternity. *Mitchell v. Leech,* 69 S. C. 413, 48 S. E. 290, 66 L.R.A. 723 (1904).

The question before us, then, is whether the local chapter's act in conducting hell night, which involved hazing and excessive drinking, fell within the scope of the agency. Included within the scope of the agency the "all acts within the apparent scope of the authority conferred on the agent[ ] by its principal[ ], as well as those expressly authorized or necessarily implied from express authority [and] all acts within the scope of the authority which the principal held the agent[ ] out to the world to possess." *Derrick v. Sovereign Camp, W.O.W.,* 115 S. C. 437, 442, 106 S. E. 222, 224 (1921) Cothran, J. (concurring).

As the record reveals, Sigma Nu's constitution allows a person to become a member of the fraternity only by joining one of Sigma Nu's 180 active collegiate chapters. The active collegiate chapters alone initiate all new members.

Although Sigma Nu by-laws prescribe a formal, quasi-religious initiation ceremony, they do not prohibit an active collegiate chapter from supplementing the initiation process by requiring candidates for membership to participate in an additional initiation activity. In this case, the active collegiate chapter required candidates for membership to participate in hell night as part of the process of initiation into Sigma Nu.

In initiating new members, the local chapter was accomplishing the purpose of Sigma Nu and was "about the business" of Sigma Nu. Indeed, as Justice Cothran observed in his concurring opinion in *Derrick v. Sovereign Camp, W.O.W.,* 115 S. C. at 443, 106 S. E. at 224, the introduction of new members "is the life blood of all such organizations." Because it was within Sigma Nu's interest that new members be received, we are satisfied that the local chapter in conducting hell night and in requiring the pledges to participate in hell night as a condition of membership in Sigma Nu acted within the scope of the apparent authority conferred on it by Sigma Nu.

That the local chapter acted within the apparent scope of its authority is shown by Barry's implicit obedience to that

authority. *Derrick v. Sovereign Camp, W.O.W., supra* (Cothran, J., concurring). Barry placed himself at the local chapter's disposal on hell night only because he wanted to become an active brother of Sigma Nu.

Sigma Nu, then, was bound by the acts of its local ■ chapter in this instance since they were performed within the apparent scope of its authority. *See Mitchell v. Leech, supra* (use of a mechanical goat as part of initiation ceremony where nothing in ritual order authorized such use within scope of authority); *Derrick v. Sovereign Camp, W.O.W., supra* (Cothran, J., concurring) (sovereign camp responsible for injuries inflicted by members of a subordinate camp during an initiation in no way authorized or prescribed by the sovereign camp); *Supreme Lodge of W.L.O.M. v. Kenny,* 198 Ala. 332, 73 So. 519 (1916), *cert. denied,* 244 U. S. 652, 37 S. Ct. 650, 61 L. Ed. 1372 (1917) (use of electrical apparatus in initiation where clause in ritual prohibited jesting or practical jokes in initiatory work within scope of subordinate lodge's authority); *cf. Easler v. Hejaz Temple of Greenville, supra* (evidence held to support a finding of agency in a cause where a candidate for membership in an unicorporated association was injured while attempting a "mattress-rotating barrel trick" during the initiation ceremony conducted by the local organization).

V.

Sigma Nu next contends that the trial court erred in allowing the testimony of Ballou's expert witness, Diane Ruth Follingstad, a clinical psychologist and an associate professor of psychology at the University of South Carolina. It challenges her testimony as being irrelevant, as relating to matters about which expert testimony was not required, as being offered without proper foundation, and as constituting hearsay.

In her testimony, Follingstad talked about group dynamics and discussed the factors noted in psychology literature usually present in group settings. She did not testify in terms of opinion.

Her testimony was offered by Ballou to assist the ■ jury in determining the issue of whether Barry was psychologically manipulated into drinking as much alcohol as he did, and issue made by the pleadings. It was

clearly relevant. *Cf. Francis v. Mauldin,* 215 S. C. 374, 378, 55 S. E. (2d) 337, 338 (1949) ("All that is required is that the fact shown legally tends to establish, or to make more or less probable, some matter in issue, and to bear directly or indirectly thereon.").

We do not agree with Sigma Nu that Follingstad's testimony related to matters of common knowledge or experience shared by the jury and was therefore inadmissible. *See* 32 C.J.S. *Evidence* § 546(62) at 264 (1964) ("[E]xperts may not testify as to matters of common knowledge or experience. . . ."). We think the reactions of individuals in group settings are a proper subject of expert testimony. In any case, whether the inquiry was one upon which expert testimony was proper was for the trial judge to determine and his ruling thereon will not be disturbed unless it appears that an abuse of discretion occurred, *Jenkins v. E. L. Long Motor Lines, Inc.,* 233 S. C. 87, 103 S. E. (2d) 523 (1958). We find no such abuse here.

Sigma Nu's complaint that the trial judge allowed Follingstad to testify about matters lacking an approriate foundation likewise has no merit. A similar complaint was voiced in *Sumner v. Pruitt,* 281 S. C. 63, 314 S. E. (2d) 150 (Ct. App. 1984). We pointed out in *Summer* that ["a] factual foundation is required when an expert is asked to draw a conclusion based on the facts as stated." 281 S. C. at 69, 314 S. E. (2d) at 154. Here, as in *Sumner,* the expert was asked to testify to the existence of certain facts that were not common knowledge but were peculiarly within the expert's knowledge by virtue of experience and study. We held in *Sumner* that expert testimony of that kind does not require a factual foundation. *Cf.* FED.R.EVID 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.").

Follingstad's expert testimony fell within that class of cases in which "the facts are to be stated by the expert witnesses, but the conclusions therefrom are to be drawn by the jury." *Hill v. Great Northern Life Insurance Co.,* 186 Wash. 167, 177, 57 P. (2d) 405, 409 (1936); 31 Am. Jur. (2d)

*Expert and Opinion Evidence* § 17 at 512 (1967); 32 C.J.S. *Evidence* § 546(60) at 258 (1964). If the jury is able with the facts supplied it by the expert witness to form a conclusion from those facts, it is the jury's sole province to do so.

Regarding the hearsay objection, Sigma Nu is quite correct, as it argues in its brief, that an expert witness, testifying to an opinion, may not base his or her opinion upon the opinion of another expert witness. *Hines v. Pacific Mills*, 214 S. C. 125, 51 S. E. (2d) 383 (1949). Here, the expert witness did not testify to an opinion. Instead, she gave expert testimony in the form of an exposition of applicable psychological principles gleaned by her from research and study that she was qualified to perform. We discern no error.

## VI.

Sigma Nu argues that the trial judge committed reversible error in refusing its request to charge the provisions of this state's "Good Samaritan Act." The Act provides:

> Any person, who in good faith gratuitously renders emergency care at the scene of an accident or emergency to the victim thereof, shall not be liable for any civil damages for any personal injury as a result of any act or omission by such person in rendering the emergency care or as a result of any act or failure to act to provide or arrange for further medical treatment or care for the injured person, except acts or omissions amounting to gross negligence or wilful or wanton misconduct.

S. C. Code of Laws § 15-1-310 (1976).

In order to warrant a reversal for refusal of the trial judge to give a requested charge, the refusal must have been both erroneous and prejudicial. *Merritt v. Grant*, 285 S. C. 150, 328 S. E. (2d) 346 (Ct. App. 1985), *cert. denied*, 286 S. C. 125, 333 S. E. (2d) 569 (1985).

Assuming, without deciding, that the record contains evidence that Sigma Nu rendered emergency care to Barry within the meaning of the Act and that Sigma Nu was not required to assert the Act as an affirmative defense, thus entitling it to the charge, Sigma Nu suffered no prejudice from the trial judge's failure to charge its

request. In returning a verdict for punitive damages, the jury necessarily found Sigma Nu guilty of willful, wanton, or reckless conduct. *Merritt v. Grant, supra.* The Act immunizes a rescuer from civil liability only where he or she is guilty of nothing more than ordinary negligence. The charge, obviously, would not have aided Sigma Nu.

The trial judge, therefore, did not commit reversible error in refusing Sigma Nu's request.

## VII.

Sigma Nu also assigns as reversible error the giving of an instruction submitting to the jury the doctrine of last clear chance.

The theory commonly referred to as the doctrine of last clear chance "means that if two persons have been at fault and their faults are in sequence, the second comer in certain circumstances will be held solely responsible for the injury." *Jerrell v. New York Central R. Co.*, 68 F. (2d) 856, 857 (2d) Cir. 1934). The doctrine traditionally allows recovery by a negligent plaintiff of his damages "when there is a certain kind of negligent omission by the defendant, i.e., the defendant fails to act in some possible way to avoid injuring a person in some apprehensible and/or discovered peril." *Seaboard Coast Line R. Co. v. Daugherty*, 118 Ga. App. 518, 522, 164 S. E. (2d) 269, 273 (1968), *cert. denied*, 397 U. S. 939, 90 S. Ct. 950, 25 L. Ed. (2d) 120 (1970). An essential element of the doctrine of last clear chance is knowledge and appreciation by the defendant of the plaintiff's peril. *Johnston v. Ward*, 288 S. C. 603, 344 S. E. (2d) 166 (Ct. App. 1986), *cert. denied*, Davis' Advance Sheets No. 39 at 1 (Ct. App. October 18, 1986).

A fair inference from the direct and circumstantial evidence already narrated is that active brothers of Sigma Nu furnished alcohol to Barry, that they induced him to drink excessive quantities of the alcohol within a short period of time, that Barry became acutely intoxicated by the alcohol and became helplessly unconscious, that members of Sigma Nu became aware of Barry's dangerous condition and understood the peril it presented, and that they cancelled whatever chance of recovery from acute intoxication he might have had because of their failure to

render him assistance by taking him to the infirmary or hospital where he could have obtained medical assistance and where there was available a higher level of treatment and a greater potential for success in preventing him from aspirating his gastric contents and dying. By this view of the evidence, Sigma Nu not only caused Barry's peril, but by the exercise of ordinary care could have prevented the injury of which complaint is made. *Cf. Leppard v. Southern R. Co.,* 174 S. C. 237, 177 S. E. 129 (1934) (wherein the court held the trial judge did not err in charging recovery was not barred even though the decedent was on a railroad track in an intoxicated condition due to his own negligence since the railroad could have avoided the injury by exercising due diligence in keeping a lookout); *Key v. Charleston & W. C. R. Co.,* 144 S. C. 164, 142 S. E. 336 (1928) (wherein the court held even though the decedent was helplessly drunk on a railroad track if the train driver could have seen him and appreciated his condition by the exercise of reasonable diligence and could have stopped the train it was his duty to do so).

The trial judge, therefore, committed no error in giving his instructions.

## VIII.

Sigma Nu further contends that the trial judge erroneously denied its motion for a mistrial based on improper remarks made by Ballou's attorney during his opening statement to the jury.

Ballou's attorney told the jury during his opening statement: "The evidence will show that ... the university policy strictly prohibited the use of alcoholic liquor ... at any organizational activity on campus. The evidence will further show that same fraternity in September of 1979 had pled guilty to a prior—." Sigma Nu objected and moved for a mistrial. The trial judge sustained the objection, issued a curative instruction, and struck the statement from the record.

The conduct of a trial, including the control of arguments by counsel, is left largely to the discretion of the trial judge. *Neal v. Darby,* 282 S. C. 277, 318 S. E. (2d) 18 (Ct. App. 1984). Here, the trial judge ruled that the statements were improper, struck them from the record, and instructed the jury

158

to disregard the statements. *See Madden v. Cox,* 284 S. C. 574, 328 S. E. (2d) 108 (Ct. App. 1985), *appeal dismissed,* 286 S. C. 127, 332 S. E. (2d) 102 (1985) (when an objection is timely made to improper remarks of counsel, the trial judge should rule on the objection, instruct counsel to desist from making such remarks, and tell the jury to disregard them). The trial judge committed no error in refusing Sigma Nu's motion for mistrial.

## IX.

Lastly, Sigma Nu maintains that "[t]he record is totally devoid of any suggestion of recklessness or willfulness on the part of [Sigma Nu]." This argument is manifestly without merit.

Accordingly, the judgment below is

Affirmed.

BELL and CURETON, JJ., concur.