**Edward GAROFALO and Monica Garofalo, Co–Administrators of the Estate of Mathew Patrick Garofalo, Deceased, Appellants,**

v.

**LAMBDA CHI ALPHA FRATERNITY, an Indiana Corporation; Lambda Chi Alpha University of Iowa Chapter, a Voluntary Association; Timothy Reier, an Individual; and Chad Diehl, an Individual, Appellees.**

**No. 98–1721.**

Supreme Court of Iowa.

Sept. 7, 2000.

Edward J. Gallagher, Jr., and Thomas C. Verhulst of Gallagher, Langlas & Gallagher, P.C., Waterloo, and David C. Wise of Corboy & Demetrio, Chicago, Illinois, for appellants.

Kevin H. Collins of Shuttleworth & Ingersoll, P.C., Cedar Rapids, for appellee, Timothy Reier.

Timothy J. Walker and Roscoe A. Ries, Jr., of Whitfield & Eddy, P.L.C., Des Moines, for appellees Lambda Chi Alpha Fraternity and Lambda Chi Alpha University of Iowa Chapter.

NEUMAN, Justice.

The principal question on this appeal is whether a "special relationship" exists between a fraternity and its members so as to create a legal duty of care, actionable in tort, when a young initiate's excessive drinking results in death. The district court concluded as a matter of law that no such duty exists under the material facts of this case. It therefore dismissed, on summary judgment, plaintiffs' wrongful death action against their son's national fraternity, its local chapter, and one of his fraternity brothers.

Having now considered the arguments on appeal, a majority of this court affirms dismissal of the action against Lambda Chi Alpha Fraternity and Timothy Reier. The district court's decision to dismiss Lambda Chi Alpha University of Iowa Chapter stands affirmed by operation of law. *See* Iowa Code § 602.4107 (1999). We remand the case for further proceedings against the remaining defendant, Chad Diehl.

## I. Scope of Review.

Because this case reaches us on appeal from entry of summary judgment, well-settled rules guide our review. We, like the district court, are obliged to view the factual record in the light most favorable to the resisting party, affording that party all reasonable inferences that the record will bear. *Hildenbrand v. Cox,* 369 N.W.2d 411, 413 (Iowa 1985). Summary judgment is proper only if the record made

shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Iowa R. Civ. P. 237(c). "If the conflict in the record concerns only the legal consequences flowing from undisputed facts, entry of summary judgment is proper." *Farm Bureau Mut. Ins. Co. v. Milne*, 424 N.W.2d 422, 423 (Iowa 1988). Whether a particular duty arises out of the parties' relationships is a matter of law properly resolved in a summary judgment proceeding. *Tenney v. Atlantic Assocs.*, 594 N.W.2d 11, 15 (Iowa 1999); *Kelly v. Sinclair Oil Corp.*, 476 N.W.2d 341, 354 (Iowa 1991). Our review, therefore, is for the correction of errors at law. *Sankey v. Richenberger*, 456 N.W.2d 206, 207 (Iowa 1990).

With these principles in mind, we turn to the record made before the district court. That record consists of the pleadings, deposition testimony, written institutional policies, and investigative reports of police officers and university officials.

## II. Facts.

Appellants Edward and Monica Garofalo are the parents of Matt Garofalo, now deceased, who was an associate member of Lambda Chi Alpha, a national fraternity with a local chapter in Iowa City, Iowa. Matt was nineteen and a sophomore at the University of Iowa when he died from pulmonary edema caused by aspiration of his gastric contents after consuming excessive quantities of beer and hard liquor. Matt consumed the alcohol following a "Big Brother/Little Brother" ceremony at the fraternity house.

The ceremony took place at about 10:00 p.m. on Thursday, September 7, 1995. It lasted fifteen to twenty minutes, followed a script, and culminated in the introduction of each new pledge to his "big brother." The purpose was to establish a mentoring relationship that would last throughout the pledge year. Attendance at the ceremony was not mandatory but most, if not all, of the members took part. No alcohol was served or consumed during the ceremony.

It was traditional following the ceremony for each big brother to invite his new little brother to his room to toast their new relationship with drinks before adjourning to downtown taverns for more serious partying. The beer and liquor consumed for this purpose was purchased by each individual big brother. This was in contrast to other fraternity functions which often involved a "slush fund" collected by the social chairman who then purchased the desired alcoholic beverages. A written fraternity policy prohibited the use of chapter funds to purchase alcohol. The policy likewise directed chapters to conform their liquor possession and distribution practices to state law and institutional policy. It appears these policies were more often honored in their breach. Virtually every witness testified that beer and other alcoholic beverages were made available to members under the legal drinking age of twenty-one. *See* Iowa Code § 123.47A (1995). Moreover, five out of the six previous visits by national fraternity officers yielded reports suggesting that alcohol emphasis within the context of social development in the house was "strong."

Matt Garofalo's assigned big brother was defendant Chad Diehl. In advance of the ceremony, Diehl purchased beer and a bottle of Southern Comfort with the intent of sharing it with Garofalo. Diehl also purchased beer and vodka for defendant Tim Reier. Reier was an older member, and a big brother, but was under age for purposes of legally purchasing alcohol. The young men set up informal bars in their rooms and shared the liquor with whomever wandered in.

Garofalo drank heavily. He drank straight from the Southern Comfort bottle, as well as other available liquor bottles, along with the forty-ounce Mickey's brew furnished by Diehl. He soon began to stagger and became loud, announcing he would drink everyone else under the table.

Diehl told him to "slow down." By 11:30 p.m. it was evident Garofalo was in no shape to go to the downtown bars. He stumbled and fell down a small flight of stairs. Diehl and Reier helped him up and decided he should lie down on a spare couch in Reier's room. At that point Garofalo was conscious and walking under his own power. But they moved him along, in Reier's words, "like an injured player from the field."

Garofalo passed out on the couch. Diehl and Reier positioned him on his side so he would not aspirate in case of vomiting. Around midnight Reier and his little brother headed down to the bars. Diehl stayed with Garofalo for roughly half an hour. He then left to attend to an altercation on the fraternity lawn. No one else took charge of Garofalo. Some time later, Diehl checked on him and found him snoring or, perhaps, "gurgling." Two young women, who had been high school classmates with Garofalo, also checked on him during the early morning hours. One found that someone had drawn a beard on his face with magic marker and painted his ear with whiteout. She wiped off his face but was not otherwise concerned about his wellbeing.

Reier returned to the fraternity house around 3:00 a.m. Garofalo was still on his couch. In Reier's words, "He was snoring and looked fine." Reier turned him over, adjusted his pillow and noted that Garofalo "looked pretty content." Reier awoke at 8:00 a.m., just in time for an 8:30 a.m. class. He glanced at Garofalo as he headed out the door. Garofalo appeared to be sleeping.

Around 11:30 a.m. it was discovered that Garofalo was dead. The rug on the floor nearby was damp and smelled of vomit. A later autopsy estimated the time of death was between 7:00 a.m. and 8:00 a.m. His blood alcohol count was .188, leading the medical examiner to conclude Garofalo's alcohol level "may have peaked at .250 to .300% eight hours before he died."

Subsequent investigations led both police and university officials to conclude that no "hazing" was involved in the events in question, i.e., no one intentionally or recklessly engaged in "forced activity" endangering the health or safety of a student as a condition of initiation into the fraternity. *See* Iowa Code § 708.10 (crime of hazing defined). The assistant dean of students reported that the liquor consumed following the ceremony "had been purchased on an individual basis rather than part of an organized activity." A police report summed up the events this way:

> The ceremony may have created an opportunity for members to be together which could have spawned an opportunity to drink alcohol, but the ceremony itself carried no imperative for consumption. Further, it appears that events after the ceremony took on different forms as well. Some members left the area, others remained at the house, while others left for the downtown to "go out" which appears to be typical for the house on a Thursday night. Indications regarding Garofalo's intake of alcohol reflect a decision on his part to consume rather than a mandate from his house mates to that effect.

## III. Proceedings.

Garofalo's parents, as co-administrators of his estate, filed a wrongful death action against the national fraternity, its Iowa chapter, Tim Reier, and Chad Diehl, as well as two other members of the Iowa chapter who were later dismissed as parties. Plaintiffs' suit alleged negligence in the defendants' conduct toward Garofalo, both in connection with the big brother/little brother ceremony and in failing to properly care for him after "securing [his] intoxication."

All four defendants moved for summary judgment in advance of trial. As to plaintiffs' claims against Tim Reier, the court found no proof that he affirmatively harmed Garofalo by furnishing him alcohol, nor did their relationship spawn a

duty on his part to care for Garofalo once he became inebriated. As for the national fraternity and its local chapter, the court found no proof that Garofalo's alcohol consumption was forced or involuntary. It also rejected plaintiffs' claim that any legal duty flowed from these defendants to Garofalo requiring them to protect him from self-inflicted harm. Finally, the court denied Diehl's motion for summary judgment. Based on evidence that Diehl furnished alcohol to Garofalo in violation of state law, and disputed facts surrounding his conduct once Garofalo became intoxicated and passed out, the court ruled summary judgment in Diehl's favor would be inappropriate. This appeal by Edward and Monica Garofalo followed.

## IV. Arguments on Appeal.

Appellants pose a three-part challenge to the district court's dismissal of their claims against the national fraternity, its Iowa chapter, and Tim Reier. First, they claim the court erred by failing to hold the Iowa chapter responsible for Garofalo's intoxication and death. Second, they contest the court's refusal to recognize the national fraternity's duty of care to Matt Garofalo and its breach. And, third, they cite error in the court's refusal to hold Reier, and other members of the chapter, accountable for Garofalo's care once he became helpless and unable to adequately protect himself. We shall consider the arguments in turn.

**A. Duty of Iowa chapter concerning consumption of alcohol.** Appellants' first point rests on a theme repeated throughout this appeal—that a "special relationship" exists between a fraternity (local and national) and its members that gives rise to a heightened duty of care and protection. They then contend that the local chapter breached that duty when its members furnished alcoholic beverages to Garofalo (1) in violation of state law, and (2) in quantities that were foreseeably dangerous. The fraternity counters that there is no legal or factual basis for these claims

under the record before us. Our consideration of the relevant principles, described below, leads us to agree.

■■■ 1. *Special relationship.* As a general rule the law imposes no duty upon an individual to act for the protection of others. Restatement (Second) of Torts § 314, at 116 (1965). Likewise, there is no duty to control the conduct of third persons so as to prevent that person from causing physical harm to another unless

> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

Restatement (Second) of Torts § 315, at 122; *accord Bohan v. Hogan,* 567 N.W.2d 234, 236 (Iowa 1997); *Sankey,* 456 N.W.2d at 209; *Hildenbrand,* 369 N.W.2d at 415. Commonly recognized "special relations" include common carrier/passenger, innkeeper/guest, landlord/invitee, and peace officer/arrestee. Restatement (Second) of Torts § 314A, at 118. In general, "special relations" are those in which the law recognizes a duty to aid or protect persons in a relationship of "dependence or mutual dependence." *Id.* cmt. *b; accord Beach v. University of Utah,* 726 P.2d 413, 415–16 (Utah 1986). So, for example, a peace officer who stops an intoxicated driver but does not take him into custody has no "special relation" with the driver such that the law will recognize a duty of protection, and impose liability upon the officer, when the driver later kills himself in an accident. *Hildenbrand,* 369 N.W.2d at 415. But a tavern owner, who has no duty to the patron who drinks himself to death, may be held to have breached a duty of care if the drunk is wrongfully expelled from the saloon, late at night, to die of cold and exposure. *Weymire v. Wolfe,* 52 Iowa 533, 534, 3 N.W. 541, 542 (1879); *accord Hildenbrand,* 369 N.W.2d at 415.

2. *Underage drinking.* Iowa statutory law prohibits a person from giving, selling, or otherwise supplying alcoholic liquor, wine, or beer to persons between the age of eighteen and twenty-one except in limited circumstances prescribed by statute. Iowa Code § 123.47A. Violation of this law will support a common law cause of action by the underage person against the person furnishing the alcohol. *Sage v. Johnson,* 437 N.W.2d 582, 584–85 (Iowa 1989). "To prevail on such a cause of action, however, a plaintiff must prove the defendant's *knowing* and *affirmative delivery* of the [alcoholic beverage] to the underage person." *Fullmer v. Tague,* 500 N.W.2d 432, 434 (Iowa 1993) (emphasis added). "The statutory term 'otherwise supply' means more than merely permitting or allowing beer to be consumed on a defendant's premises." *Id.* (citing *DeMore v. Dieters,* 334 N.W.2d 734, 737 (Iowa 1983)); *accord Snyder v. Fish,* 539 N.W.2d 197, 199 (Iowa App.1995).

3. *Analysis.* Appellants seek to bring the local chapter within the reach of these rules regarding duty and underage drinking. Several jurisdictions have considered similar laws in the context of injuries stemming from fraternity parties. But the cases upon which appellants rely all involve coerced consumption of enormous amounts of alcohol by underage pledges as an integral part of organized fraternity initiation ceremonies. *See, e.g., Quinn v. Sigma Rho Chapter of Beta Theta Pi Fraternity,* 155 Ill.App.3d 231, 107 Ill.Dec. 824, 507 N.E.2d 1193, 1195 (1987) (as part of pledge night initiation ceremony, each pledge directed to drink forty-ounce pitcher of beer "without letting the pitcher leave the pledge's lips or until the pledge vomited" followed by an eight ounce bottle of whiskey); *Ballou v. Sigma Nu Gen. Fraternity,* 291 S.C. 140, 352 S.E.2d 488, 491 (Ct.App.1986) (pledges, clad only in underwear, expected to "chug . . . unknown mix of intoxicating liquids of undisclosed alcoholic strength" at mandatory hell-night initiation party); *Haben v.*

*Anderson,* 232 Ill.App.3d 260, 173 Ill.Dec. 681, 597 N.E.2d 655, 660 (1992) (recognizing cause of action against fraternity where consuming alcohol a requirement of membership and in violation of law prohibiting hazing); *Oja v. Grand Chapter of Theta Chi Fraternity, Inc.,* 174 Misc.2d 966, 667 N.Y.S.2d 650, 651 (N.Y.Sup.Ct. 1997) (recognizing cause of action brought by estate of deceased son "who died as the result of alcohol poisoning suffered in the course of a night of hazing conducted at the defendant fraternity").

Appellants suggest these cases rest on a "special relationship" between a fraternity and its members which, they argue, gives rise to a duty to protect the initiates from harming themselves through excessive drinking. In fact the cited cases recognize an affirmative duty on the part of the fraternities and their members not to cause injury, through violation of underage drinking and hazing laws, during the initiation process. *Quinn,* 107 Ill.Dec. 824, 507 N.E.2d at 1198 (duty to conduct initiation free from unreasonable risk of harm); *Ballou,* 352 S.E.2d at 492 (fraternity owes "duty to its initiates not to cause them injury in the process"). The distinction is important as we consider the summary judgment record before us.

In contrast to the cases cited by appellants, the facts established in the record before us reveal no affirmative harm by the Iowa chapter of Lambda Chi Alpha, illegal or otherwise, toward Garofalo. The drinking that ultimately led to Garofalo's death was not part of any initiation ritual or ceremony. No chapter funds were used to purchase the liquor. It is true that tradition played a part in the decision by individual members to drink with underage pledges after the ceremony, and liquor was bought for that very purpose. But appellants have come forward with no proof to suggest, even impliedly, that Garofalo or any other member's consumption was coerced or required as a condition of chapter membership. To the contrary, the record yields proof that Garofalo was an expe-

rienced, if not sensible, drinker and that at least one of his peers chose not to drink at all. Thus we are unpersuaded by appellants' claim that disputed factual issues exist concerning the voluntariness of Garofalo's conduct. *See Fullmer,* 500 N.W.2d at 435 (party resisting motion for summary judgment must come forth with specific facts demonstrating the existence of genuine issue for trial).

Viewing the record in the light most favorable to the appellants, we find no support for their claim that the Iowa chapter stood in a "special relation" to Matt Garofalo or affirmatively breached a duty owed to him. Neither the chapter nor its members (with the exception of defendant Chad Diehl) furnished him alcohol in violation of statute. Garofalo's consumption of alcoholic beverages was not required or compelled as a condition of membership in the chapter. In short, the ideals of fellowship espoused by the chapter are insufficient, standing alone, to create a duty on the part of the chapter to protect Garofalo from his voluntary, adult choice to drink to excess. The district court was correct in so ruling.

■ **B.** *Duty of national chapter.* Appellants claim the national fraternity "had a duty to control the conduct of the Iowa chapter and its members to prevent them from causing physical harm to the Chapter's initiates, including Garofalo." Their argument rests on national executives' knowledge that alcohol consumption occupied a prominent place in the social activities of the Iowa chapter. They contend the undisputed record shows the national organization did nothing to enforce its alcohol policies, university regulations or state law. By failing to hold offending members accountable for supplying alcohol to underage persons, appellants argue, the fraternity breached its duty to prevent foreseeable risk of harm from excessive consumption.

For all the reasons explained in the preceding division, the national fraternity had no more duty than the Iowa chapter to protect Garofalo from his decision to drink following the big brother/little brother ceremony. It neither furnished the alcohol he consumed nor forced him to consume it as part of any recognized fraternal activity. In analogous cases in which parents have sought to hold universities responsible for injuries resulting from the drinking habits of their adult but underage children, the majority of courts have held that the adoption of institutional policies prohibiting underage drinking do not establish custodial relationships between the institution and its students so as to impose a duty of protection on the part of the institution. *See Bradshaw v. Rawlings,* 612 F.2d 135, 141 (3rd Cir.1979); *Booker v. Lehigh Univ.,* 800 F.Supp. 234, 237–38 (E.D.Pa. 1992); *Beach,* 726 P.2d at 419–20. As the *Beach* court noted, such a policy or code of behavior may authorize discipline by the college or, in this case, the fraternity, but it does not change the nature of their relationship. *Beach,* 726 P.2d at 420.

The district court properly recognized that a fraternity is not a custodial institution and its members, as adults, are free to make choices about their use and abuse of alcohol. No care-taking function is involved. We are unaware of any legal authority which would elevate the fraternity's failure to enforce its "Policy on Alcoholic Beverages" to an actionable civil tort. *See Bohan,* 567 N.W.2d at 236–37 (mere failure to act will give rise to legal duty only where special relationship is established). The district court properly granted the national fraternity judgment as a matter of law on this issue.

**C.** *Duties arising under Restatement (Second) of Torts § 324.* In their third assignment of error, appellants contend the court improperly rejected—except as to Chad Diehl—their claim that Tim Reier and other chapter members breached their duty to "take charge" of Garofalo once he passed out from intoxication. Their argument rests on Restatement (Second) of Torts section 324, captioned "Duty of One

Who Takes Charge of Another Who is Helpless." The rule states:

> One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by
>
> (a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or
>
> (b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him.

Restatement (Second) of Torts § 324, at 159. Appellants claim it is for a jury, not the court, to determine from the evidence whether chapter members and Reier, in particular, reasonably exercised their duty to Garofalo under the rule.

Comment *b* to section 324 of the Restatement specifically states that the rule applies to an actor who takes charge of one who is drunk. The standard required is reasonable care. *See id.* cmt. *d.* When the actor has not contributed to the person's condition or made it worse, the commentary describes the actor's duty this way:

> [W]here the other's only ground of complaint is that he has failed to receive benefit from the actor's assistance, the gratuitous nature of the services is an important factor in determining whether the actor has exercised reasonable care. The care which the actor must exercise is only that which the recipient of the gratuitous services is entitled to expect. Thus the actor is not required to conform to a high standard of diligence and competence, to possess any special skill, or to subordinate his own interests to those of the other, to the same extent as would be necessary if the services were obligatory or for compensation. He must, however, act in good faith and with common decency, with due allowance made not only for physical infirmi-

ties of the actor but also for any inferiority in intelligence and judgment.

*Id.*

At the outset we reject appellants' assertion that Reier's status as Garofalo's fraternity brother created a "special relationship," custodial in nature, that gave rise to a heightened duty to protect him. The contours of Reier's legal duty to Garofalo are not measured by the "ideals and goals of the fraternity" as appellants argue. Reier may have felt a moral obligation to look out for his fraternity brother but we know of no law imposing upon him an enhanced legal responsibility based solely on that relationship. The same holds true for other members of the fraternity. Moreover, appellants have mustered no specific facts in resistance to the chapter's motion for summary judgment to pin the "take-charge" duty on any other members but Diehl and Reier.

Thus the question boils down to whether Reier "took charge" of Garofalo on the night in question. Appellants contend Reier assumed this duty when he permitted Garofalo to lie down on the couch in his room. He acted reasonably, they concede, when he left Garofalo in Diehl's care while he went downtown. Upon Reier's return to the fraternity house, however, they contend his duty resumed. They fault Reier for "going to bed" and failing to "constantly monitor or check on Garofalo throughout the remainder of the early morning hours of September 8." They cite the fact that Reier made no attempt to awaken Garofalo before he left for class as evidence that he breached his duty to him.

We, like the district court, do not believe that these facts, viewed in their most favorable light, establish a special duty running from Reier to Garofalo based on section 324 of the Restatement. Reier was not responsible for Garofalo's intoxication. He was not his "big brother." He merely let Garofalo "sleep it off" on his couch. Even if these facts could be stretched to fit

the notion of "taking charge," Reier's conduct reveals no breach of that duty. When he left the fraternity house at midnight, Garofalo was intoxicated but conscious. When Reier returned to his room at 3:00 a.m., Garofalo was asleep and snoring. Reier repositioned him on his side, mindful for his safety. When he hurried out the door for an 8:30 a.m. class, Reier glanced at Garofalo, assumed he was asleep and made no attempt to awaken or "revive" him. Although appellants fault this latter omission, we believe the standard urged by appellants is substantially higher than what is required under the Restatement. Given the gratuitous nature of the undertaking, the rule requires only acting in "good faith and with common decency" and relieves the actor from responsibility for "a high standard of diligence and competence, to possess any special skill, or to subordinate his own interests to those of the other." *Id.* cmt. *d.* Thus Reier, and the chapter, were entitled to judgment as a matter of law on this claim.

**AFFIRMED AS TO DEFENDANTS LAMBDA CHI ALPHA FRATERNITY AND TIMOTHY REIER, AFFIRMED BY OPERATION OF LAW AS TO LAMBDA CHI ALPHA UNIVERSITY OF IOWA CHAPTER AND REMANDED.**

McGIVERIN, C.J. and CADY, J. concur in this opinion.

LAVORATO and LARSON, JJ. concur in division IV.B of the majority opinion and dissent as to divisions IV.A and IV.C.

TERNUS, J. concurs in all but division IV.A of the majority opinion and joins divisions I and II of the dissent.

CARTER and SNELL, JJ. take no part.

LAVORATO, Justice (concurring in part and dissenting in part).

I concur in division IV.B of the majority opinion. I dissent as to divisions IV.A and IV.C. For reasons that follow, I conclude there are genuine issues of material fact sufficient to overcome the defendants' motions for summary judgment as to the Iowa chapter and Timothy Reier. Of course, implicit in my conclusion is that both defendants owed a duty to the decedent. I will address the law and facts that I find establish a duty running from each defendant to the decedent.

**I. Vicarious Liability of the Iowa Chapter.**

Contrary to the majority's position, I think a genuine issue of material fact exists on whether the Iowa chapter violated Iowa Code section 123.47A(1) (1995)—Iowa's underage drinking statute. That statute provides in part:

A person shall not sell, give, or otherwise supply alcoholic liquor, wine, or beer to any person knowing or having reasonable cause to believe that the person is age eighteen, nineteen, or twenty.

As the majority correctly notes, a violation of section 123.47A(1) will support a common-law cause of action by the underage person against the person furnishing the alcohol. *Sage v. Johnson,* 437 N.W.2d 582, 584–85 (Iowa 1989).

We have said that

[n]egligence is the breach of legal duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risks. It has been defined as conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm. It is immaterial whether the standard is one imposed by the rule of common law requiring the exercise of ordinary care not to injure another, *or is imposed by statute designed for the protection of others.*

*Lewis v. State,* 256 N.W.2d 181, 188 (Iowa 1977) (emphasis added) (citations omitted). *Lewis* held that section 123.43—predecessor to section 123.47A(1)—"sets a minimum standard of care for conduct generally required of the reasonably prudent man under like circumstances for purposes of a common law action of negligence based on the sale or the furnishing of intoxicating liquor." *Id.* at 189. In short, section

123.47A(1) imposes a duty not to furnish alcohol to underage persons and a breach of that duty is negligence.

The key issue here is whether a genuine issue of material fact exists on whether the Iowa chapter sold, gave, or otherwise supplied alcohol to the decedent, who was underage at the time of this tragic incident. The terms "sell," "give," and "supply" in section 123.47A(1) require a defendant's knowing and affirmative delivery of alcohol to an underage person. *Snyder v. Fish,* 539 N.W.2d 197, 199 (Iowa App. 1995). "Otherwise supply" in this statute "means more than merely permitting or allowing beer to be consumed on a defendant's property." *Fullmer v. Tague,* 500 N.W.2d 432, 434 (Iowa 1993) (citing *De-More v. Dieters,* 334 N.W.2d 734, 737 (Iowa 1983)). However, as we noted in *Fullmer,* for a violation of the statute to occur, a defendant need "not personally fill his guests' beer glasses." *Fullmer,* 500 N.W.2d at 436 (holding that jury could find host supplied beer to minor on the basis that the host bought the beer, provided the cups, and joined in the party, observing his underage friends drinking from the keg, despite his claim that it was "help yourself" or "pour your own" beer party so that he made no affirmative delivery of the beer to the minor).

There is no evidence that the Iowa chapter sold alcohol to the decedent. The narrow issue then is whether there was enough evidence to generate a fact issue on whether the Iowa chapter gave or otherwise supplied alcohol to the decedent.

At the time of the decedent's death, the Iowa chapter leased a fraternity house in Iowa City from Iowa Colony House Corporation. The Iowa chapter at the time was a voluntary association. There is no allegation in the petition or facts that indicate the Iowa chapter was an incorporated association, so I proceed on the assumption that it was an unincorporated association.

An association "is a collection of persons who have united or joined together for some special purpose or business, and who are called, for convenience, by a common name." 7 C.J.S. *Associations* § 2, at 22 (1980). The rule regarding the liability generally of members of an unincorporated association has been stated as follows:

> While mere membership in an association does not of itself impose liability for the acts of the associates, at least in the absence of participation and knowledge or approval, liability of members of a voluntary, unincorporated association may be established by a public act of the association itself, or by the acts of officers, agents, or members where such acts are known to the membership and actively or passively approved.

7 C.J.S. *Associations* § 30, at 74.

Iowa law has long followed these principles. In the area of contracts, "where members contract in the name of an unincorporated association, they and all of the members who authorize, approve, consent, and ratify the contract are personally liable for the obligations of such contract." *Wilson & Co. v. United Packinghouse Workers of Am.,* 181 F.Supp. 809, 815 (N.D.Iowa 1960). Members of an unincorporated association may also be personally liable for torts of the association. *Id.* at 815–16.

At common law, an unincorporated association had no legal existence, so it could neither sue nor be sued in its association name only. *Presbyterian Church of Osceola v. Harken,* 177 Iowa 195, 199–200, 158 N.W. 692, 694 (1916). However, this court recognized early on that, if the individual members of the association were so numerous as to make it impracticable to bring them all before the court, one or more of the members could be sued as representatives of the others. *Keller & Bennett v. Tracy,* 11 Iowa 530, 531 (1861). If the plaintiffs choose this route, "the members of the association are treated as a whole and the unincorporated association is in effect treated as a legal entity." *Wilson,* 181 F.Supp. at 817. In this scenario, any money judgment recovered would be

paid out of the funds of the association and would not be enforceable against the members individually. *Id.*

Of course, the plaintiffs have a second option: suit against the members individually. *Id.* Under this option, any money judgment recovered would be enforceable against the individuals. *Id.* at 815.

Here, the plaintiffs have chosen to treat the Iowa chapter as a legal entity because the plaintiffs have not sued all of the chapter members and has asked only for relief against the Iowa chapter and not against all of the members individually. There is, however, one flaw in the plaintiffs' choice of procedure: the plaintiffs have not named any members as representatives of the Iowa chapter. Because the defendants have raised no issue on this point, I will proceed on the assumption that the suit was properly instituted against the Iowa chapter as a legal entity.

As mentioned, members of an unincorporated association may be liable for the acts of officers, agents, or members of the association when such acts are known to the membership and actively or passively approved. From this, it necessarily follows that the association as an entity may be vicariously liable for such acts. This is so because an association can only act through its officers, agents, and members.

This vicarious liability finds support in Restatement (Second) of Agency section 213 (1958), which pertinently provides:

A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:

. . . .

(c) in the supervision of the activity; or

(d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

The evidence in this case is that underage drinking in the Iowa chapter house was the norm rather than the exception long before the incident in question. As the majority itself notes, virtually every witness testified that beer and other alcoholic beverages were made available to underage members. A reasonable inference from the record is that virtually every member was aware this was happening and virtually every member, passively if not actively, approved of the practice.

A report of the university investigation of the incident revealed that many of the twenty-four new members who participated in the "Big Brother/Little Brother" ceremony consumed alcohol purchased by other chapter members in the chapter house after the ceremony. The report further revealed that all twenty-four new members were under the legal drinking age, as were many of the active members. Besides the forty-eight little brothers and big brothers, at least twelve other chapter members came to the ceremony, bringing the total number of members in attendance to sixty. Additionally, the report noted that three new members passed out as a result of the alcohol consumption, including the decedent. The report also noted that the decedent consumed all of the liquor provided him by chapter members within one hour after the conclusion of the ceremony.

According to the investigation report, active members, including some chapter officers (defendant Chad Diehl was the vice-president of the chapter), purchased alcohol before the ceremony with the intention of offering it to new members after the ceremony had concluded. Following the ceremony, alcohol was available in three rooms on the second floor of the chapter house and in three rooms on the third floor of the house. In all six rooms, hard liquor was available as well as beer, and in several rooms more than one variety of hard liquor was consumed. There was some evidence that other rooms in addition to the six offered an open bar.

The decedent's drinking spree occurred in three of the rooms.

All of this drinking was traditional following the "Big Brother/Little Brother" ceremony and that included drinking by underage members and associate members.

The university concluded that the postceremony activities took place in the course of the Iowa chapter's affairs. The university suspended the chapter, finding that it did not exercise reasonable preventive measures to ensure compliance with relevant policies (one of which was to comply with Iowa's underage drinking statute) in the course of the chapter's affairs.

Before this incident, the Iowa chapter had ten to twelve parties during a sixteen-week semester. Alcoholic beverages were available at all the parties. Although the policy was that no underage drinking was to be allowed, in fact underage persons did have access to alcohol at these parties. In 1993, the Iowa chapter put itself on probation with the national fraternity for violation of the alcohol policy against permitting underage drinking at chapter events.

Viewing all of this evidence in the light most favorable to the plaintiffs, I conclude a genuine issue of material fact exists as to the Iowa chapter's vicarious liability under section 213 of the Restatement (Second) of Agency. All of this evidence would support a finding that the Iowa chapter permitted underage drinking on its premises in the past and on the night in question in clear violation of Iowa law. Additionally, the evidence would support a finding that the Iowa chapter was negligent in supervising activities on its premises in the past and on the night in question to avoid such a violation. In short, there is evidence to support a finding that the Iowa chapter gave or otherwise supplied through its members alcohol to the decedent who was underage at the time.

**II. Failure of the Iowa Chapter to Render Aid to the Decedent Under Re-statement (Second) of Torts Section 322 (1965) Based on Vicarious Liability.**

As mentioned, there is evidence to support a finding that the Iowa chapter gave or otherwise supplied through its members alcohol to the decedent who was underage at the time. The evidence would also support a finding that as a result of this violation of the law the decedent became intoxicated to the point that he was helpless.

Two members of the Iowa chapter—Chad Diehl and Timothy Reier—took charge of the decedent just before he passed out. The district court concluded a genuine issue of material fact existed regarding Diehl's liability under Restatement (Second) of Torts, section 322, and Diehl has not appealed from that ruling. This provision provides:

> If the actor knows or has reason to know that by his conduct, whether tortious or innocent, he has caused such bodily harm to another as to make him helpless and in danger of further harm, the actor is under a duty to exercise reasonable care to prevent such further harm.

Diehl and Reier first took charge of the decedent when they helped him to Reier's room after the decedent fell down a flight of stairs at the chapter house. The decedent passed out in Reier's room. Reier left the house to go to a bar with his "little brother" while Diehl remained behind with the decedent. After the decedent passed out, Diehl positioned him on his side in order to reduce the chance that he would choke on his own vomit. Diehl continued to monitor the decedent's condition until about 2:30 a.m., when he retired to bed in another room.

As members of the Iowa chapter and friends returned from downtown during the early morning hours, they saw the decedent passed out. Between midnight and 6 a.m., many of them listened for signs of life, and some rearranged the decedent's sleeping position when they saw he was

not sleeping on his side. The decedent was making gurgling noises. One of the decedent's friends shook the decedent and yelled at him but got no response.

Reier returned to his room at approximately 3:30 a.m. with his "little brother" who observed the decedent lying on his back and heard him making gurgling sounds. Reier rearranged the decedent's position by placing him on his right side and then went to bed. Reier woke up at 8 a.m. and left for class some fifteen minutes later without ever checking on the decedent, who appeared to be sleeping and still laying on his right side.

About three hours later, the decedent was discovered dead. The rug on the floor nearby was damp and smelled of vomit. A reasonable inference from this evidence and from the autopsy report is that the decedent died because he choked on his own vomit.

There is in evidence a publication from the national fraternity that was made available to each member of the Iowa chapter containing advice regarding intoxicated persons. One section of the publication states: "If the person passes out, monitor his or her breathing to make sure it's normal. If the person cannot be revived, call for medical help immediately. Constantly monitor a person while he or she sleeps. It's better for a person to sleep on his or her side, in case of vomiting." In his deposition, Reier testified that these instructions were common sense to him.

All of this evidence would support a finding that Diehl and Reier realized that the decedent in his helpless condition was at risk for vomiting and choking on his own vomit—the very thing that killed him. The evidence would also support a finding that their inactions—failure to constantly monitor the decedent and call for adequate assistance, medical or otherwise—indicate a lack of reasonable care on their part. Under the vicarious liability theory earlier discussed, I think this breach of duty under section 322 of the Restatement (Sec-

ond) of Torts could be imputed to the Iowa chapter. There was evidence that other members of the Iowa chapter were aware of the decedent's condition but did nothing. The only two members who did do something did not do enough under the law.

### III. Duty to Render Aid Running from Reier to the Decedent Under Restatement (Second) of Torts Section 324 (1965).

The majority concludes that the facts I have discussed relative to Reier's conduct do not establish a duty running from Reier to the decedent under Restatement (Second) of Torts section 324 (Duty of One Who Takes Charge of Another Who is Helpless). I disagree.

Section 324 provides:

One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by

(a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or

(b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him.

I think the facts regarding Reier's conduct would support the following findings. Reier together with Diehl took charge of the decedent when they placed him in Reier's room. Although Reier left Diehl in charge, the fact finder could find that Reier by leaving was not discontinuing his aid because on his return Reier (1) repositioned the decedent after decedent made gurgling sounds and was lying partially on his back and (2) made no objection to the decedent remaining in the room. Based on these findings, the fact finder could conclude that Reier assumed a duty to care for the decedent by monitoring him during the night or seeking medical attention or other assistance for the decedent.

*See Haben v. Anderson,* 232 Ill.App.3d 260, 173 Ill.Dec. 681, 597 N.E.2d 655, 660 (1992) (held that complaint stated cause of action ,against member of university club for breaching a voluntarily assumed duty to care for recruit who drank excessive amounts of alcohol by alleging that the member allowed the recruit to be placed on his floor unconscious, that he checked on him during the night and heard him gurgling, that he allowed the recruit to remain there, and that the recruit died of acute alcohol intoxication).

I would reverse and remand for further proceedings as to the Iowa chapter and Reier.

LARSON, J., joins this concurrence in part and dissent in part.

TERNUS, J., joins divisions I and II of this concurrence in part and dissent in part.